7 Cal.Rptr.3d 483 (2003)
114 Cal.App.4th 177
The PEOPLE, Plaintiff and Respondent,
v.
Sebastian WOLFE, Defendant and Appellant.
No. E032675.
Court of Appeal, Fourth District, Division Two.
December 11, 2003.
*485 Wilson Adam Schooley, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Lilia E. Garcia, Supervising Deputy Attorney General, and Janelle Boustany, Senior Deputy Attorney General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

*484 OPINION
RICHLI, J.
Defendant Sebastian Wolfe lived with his mother in a trailer park. On May 9, 2001, a police officer saw several firearms in their trailer. On May 11, 2001, having learned that defendant had a misdemeanor conviction that made it illegal for him to possess a firearm, police officers searched the trailer. Defendant told them, "[M]y guns are in the light fixture[] above the kitchen...." In that light fixture, as well as elsewhere in the trailer, the police found sundry firearms.
A jury found defendant guilty on one count of possession of a firearm with a qualifying misdemeanor. (Pen.Code, § 12021, subd. (c)(1).) He was sentenced to three years' probation, on terms including participation in the Mental Health Treatment Program.
In the published portion of this opinion, we hold that the trial court erred by failing to give a unanimity instruction. There is a split of opinion regarding the harmless error standard applicable to this error; we hold that the beyond-a-reasonable-doubt standard of Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (Chapman) applies. Finally, however, we hold that, even under this standard, the error was harmless.
In the unpublished portion of this opinion, we find no other error. Hence, we will affirm.

I

FACTUAL BACKGROUND

A. The Prosecution Evidence.

Defendant lived with his mother, Charlotte Sharp, in a trailer park in Palm Desert. His mother owned the trailer and rented the space.
On May 9, 2001, around 2:30 or 3:00 p.m., Sheriff's Deputy Bill Conoway went to the trailer to talk to defendant about a report of a stolen vehicle. Defendant's *486 mother let Deputy Conoway into the trailer to look for defendant. Deputy Conoway saw two handguns on the living room floor. He also saw three soft rifle cases leaning against the living room wall; when he touched them, they felt as if they contained rifles. Defendant, however, was not in the trailer. About five minutes later, Deputy Conoway found defendant by the pool and spoke to him.
Later on May 9, about 6:00 p.m., Deputy Conoway returned to the trailer in response to a report of a disturbance. He found defendant in the trailer. With defendant's consent, he walked through the whole trailer. He did not see any firearms.
On May 11, Deputy Conoway and other officers arrived at the trailer to execute a search warrant for the guns. Defendant was detained and placed in Deputy Conoway's patrol car. After about 15 minutes, Deputy Conoway got into the patrol car with him. Defendant said, "Those motherfuckers will never find the guns. Since you are my baby Jesus and I want you to be the hero, I'll tell you where the guns are at." Deputy Conoway replied, "[W]here are the guns [?]" Defendant answered, "[M]y guns are in the light fixtures above the kitchen and the ammunition is in [a] cupboard next to the refrigerator."
Inside the trailer, the police found the following firearms:
1. A Remington .30-06 rifle. It was not loaded. However, .30-06 ammunition was found in a kitchen cupboard.
2. A 6.35-millimeter (equivalent to .25-caliber) semiautomatic handgun.
3. A Colt .38-caliber revolver.
4. A Winchester 16-gauge shotgun. It appeared to be an antique.
5. A bolt-action Sharps shotgun. It, too, appeared to be an antique.
6. A Colt .45-caliber semiautomatic handgun.
The .30-06 rifle was found in the shower. Otherwise, the appellate record is somewhat confusing as to which firearms were found where. Three guns were found in a "cutout" portion of a fluorescent light fixture in the kitchen ceiling, over a china cabinet or cupboard. As best we can tell, these were the 6.35-millimeter pistol, the Colt .38, and the 16-gauge shotgun. The Colt .45 seems to have been found in another cupboard over the refrigerator. Finally, the Sharps shotgun seems to have been found in a "study area" off the kitchen.
The police found .22 and .38 caliber ammunition in a kitchen cupboard. The guns Deputy Conoway had seen on May 9 were not found. Likewise, the rifle cases he had seen were not found. His report of his investigation on May 9, 2001, did not mention any firearms. None of the guns were fingerprinted. The Department of Justice kept the 16-gauge shotgun and the Sharps shotgun for its historical gun collection.
It was stipulated that defendant had been convicted of a misdemeanor in 1996 and that, as a result, he was prohibited from owning or possessing a firearm.

B. The Defense Evidence.

Defendant's mother testified that all of the firearms in the trailer belonged to her. She knew that defendant could not own or possess firearms, but she thought she could have guns in her own home. Defendant knew where the guns were, but he had no control over them. He could not touch them or move them around, and he did not.
*487 The .30-06 shotgun had belonged to her deceased first husband. It was operable, but unsafe because it misfired occasionally. It was in the shower because she was going to take it to be repaired.
She had inherited most of the other guns from her father. For example, the 6.35-millimeter was "a little purse gun that [her] father bought for [her] mother ..., probably during World War II." She had no ammunition for it.
The Colt .38 had also been passed down through her father's family. She did not know if it was operable.
The Winchester 16-gauge shotgun had belonged to her father. He had gotten it when she was a child, for hunting. She did have ammunition for it.
The Sharps shotgun was a Civil War weapon. It had belonged to her grandfather. It had no firing pin. She had no ammunition for it  indeed, ammunition for it was no longer manufactured.
The Colt .45 had belonged to her father. She testified that it was inoperable. However, she admitted having .45 ammunition.
Defendant's mother testified that she also owned the two handguns Deputy Conoway had seen on the floor on May 9. She was not the person who had put them on the floor; she had been surprised to see them there. One was a .357 magnum that had belonged to her first husband. The other was a .22 Ruger handgun. She denied that, on May 9, there were any rifles or rifle cases to be seen.
On May 11, she testified, the police did not find these two guns because they were in the dishwasher. She was not the person who had put them in the dishwasher. Afterwards, her son-in-law told her they had been there. Her son-in-law later sold them without her permission.
She kept the guns in the light fixture and in the cupboard over the refrigerator to hide them from burglars. There had been some burglaries in the trailer park. A friend of hers had cut the holes in the ceiling and had put in clear plastic so she would have more light for the dishes in the china cabinet. He had never finished the job.
On May 9, 2001, she was very angry with defendant. As a result, she told Deputy Conoway that he was a gun collector. This was not true.
In 1996, as a result of defendant's misdemeanor conviction, the Sheriff's Department had taken all the firearms. In a civil action, a trial court determined that they belonged to her and ordered them returned to her. Because defendant was living with her, and because he was not allowed to possess firearms, she had an acquaintance keep them at his house. In 2000, she became concerned because the acquaintance often was away from home and had housesitters. She had him return the firearms to her.

II-IV[**]

V

FAILURE TO GIVE A UNANIMITY INSTRUCTION
Defendant contends the trial court erred by failing to give a unanimity instruction. (E.g., CALJIC No. 17.01.)

A. The Need for a Unanimity Instruction.

"In a criminal case, a jury verdict must be unanimous. [Citations.].... Additionally, the jury must agree unanimously the defendant is guilty of a *488 specific crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (People v. Russo (2001) 25 Cal.4th 1124, 1132, 108 Cal.Rptr.2d 436, 25 P.3d 641.) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the `theory' whereby the defendant is guilty. [Citation.]" (Ibid.)
Defendant understandably relies on this court's opinion in People v. Crawford (1982) 131 Cal.App.3d 591, 182 Cal.Rptr. 536. There, officers found the defendant and his girlfriend in his bedroom. They also found a .357 magnum in a holster at the foot of the bed and a .22 Luger in the bedroom closet. Both the defendant and his girlfriend denied ever seeing the gun in the holster. The girlfriend testified that the gun in the closet belonged to her. On rebuttal, the prosecution introduced evidence that two more firearms, a .38 derringer and another .357 magnum, had been found in an upstairs bedroom in which a third person was sleeping. (Id. at pp. 594-595, 182 Cal.Rptr. 536.) The defendant was convicted of possession of a firearm following a felony conviction. (Id. at p. 593, 182 Cal.Rptr. 536.)
We held that the trial court erred by failing to give a unanimity instruction sua sponte: "[C]ertain jurors might have been convinced defendant possessed one weapon, while others were convinced he possessed another weapon without all jurors at a minimum believing he possessed any one weapon. It is this unacceptable possibility which taints the verdict in this case." (People v. Crawford, supra, 131 Cal.App.3d at p. 596, 182 Cal.Rptr. 536.)
We acknowledged that a unanimity instruction is not required "where the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place...." (People v. Crawford, supra, 131 Cal.App.3d at p. 599, 182 Cal.Rptr. 536.) We concluded, however that this exception did not apply: "The acts of constructive possession involving the four guns are different. While possession of all guns was not fragmented as to time, the possession was fragmented as to space. Guns were in different parts of the house; the evidence showed unique facts surrounding the possessory aspect of each weapon." (Ibid.) "Certain jurors might quite easily have been persuaded beyond a reasonable doubt that appellant possessed one gun, but not another." (Id. at p. 598, 182 Cal.Rptr. 536; see also People v. Wesley (1986) 177 Cal.App.3d 397, 400-401, 223 Cal.Rptr. 9 [unanimity instruction was required where police found cocaine on table and heroin in defendant's waistband].)
We also held that a unanimity instruction was required even though the defendant's simultaneous possession of multiple firearms constituted only a single crime. (People v. Crawford, supra, 131 Cal.App.3d at p. 596, 182 Cal.Rptr. 536.) This view has since been called into question. More recent cases indicate that a unanimity instruction is not required if the evidence shows only a single crime, albeit committed in several possible ways. (E.g., People v. Hernandez (1995) 34 Cal.App.4th 73, 77-80, 40 Cal.Rptr.2d 223; People v. Perez (1993) 21 Cal.App.4th 214, 217-223, 26 Cal.Rptr.2d 691; People v. Davis (1992) 8 Cal.App.4th 28, 41, 10 Cal.Rptr.2d 381; see also People v. Russo, supra, 25 Cal.4th at pp. 1134-1135, 108 Cal.Rptr.2d 436, 25 P.3d 641.)
*489 We need not decide, however, whether Crawford is still good law on this point. After Crawford was decided, the Legislature changed the definition of the possession of a firearm with a felony or qualifying misdemeanor conviction. Now, the possession of multiple firearms  even simultaneously  constitutes multiple offenses. (Pen.Code, § 12001, subd. (k).) Here, the information charged only one count of unlawful possession; it alleged that "on or about May 11, 2001, ... [defendant] did willfully and unlawfully own or have in his possession or under his custody or control, a firearm ..." There was evidence, however, from which the jury could have found that defendant was in possession of up to eight separate firearms. Thus, there was evidence that he committed up to eight separately chargeable crimes. Accordingly, a unanimity instruction would be required under either line of cases.
We believe the trial court here erred by failing to give a unanimity instruction. As in Crawford, defendant's possession of the various firearms was "fragmented as to space." Here, moreover, it was fragmented as to time. And, again as in Crawford, the circumstances surrounding the possession of the different firearms were significantly different. For example, there was evidence that defendant actually touched and moved the guns Deputy Conoway saw on May 9. Defendant's mother testified that she did not put them on the floor or, thereafter, in the dishwasher; inferably, defendant did. She also testified that they were in the dishwasher on May 11. Thus, some jurors may have found defendant guilty based on these guns. Other jurors may have been reluctant to convict defendant based on those guns, reasoning that defendant's brother-in-law inferably had access to the trailer and may have been the person who moved them, the police did not find them on May 11, and defendant never referred to them as "my guns." Such jurors would instead have found that defendant possessed the guns found on May 11.
We therefore turn to whether the error was prejudicial.

B. The Applicable Harmless Error Standard.

On the applicable standard of harmless error, there is a split of opinion. In People v. Vargas (2001) 91 Cal.App.4th 506, 110 Cal.Rptr.2d 210 [Sixth Dist.], the court held that the state law standard of People v. Watson (1956) 46 Cal.2d 818, 299 P.2d 243 (Watson) applied. It reasoned that there is no federal constitutional right to a unanimous jury verdict; the right to a unanimous jury verdict, and hence the right to a unanimity instruction, derives from our state Constitution. (Vargas, at p. 562, 110 Cal.Rptr.2d 210; see Cal. Const., art. I, § 16.) Other cases applying the Watson standard include People v. Turner (1983) 145 Cal.App.3d 658, 681-682, 193 Cal.Rptr. 614 [Fourth Dist., Div. One], disapproved on other grounds in People v. Newman (1999) 21 Cal.4th 413, 415, 422, fn. 6, 87 Cal.Rptr.2d 474, 981 P.2d 98 and People v. Majors (1998) 18 Cal.4th 385, 411, 75 Cal.Rptr.2d 684, 956 P.2d 1137; People v. Patrick (1981) 126 Cal.App.3d 952, 967, 179 Cal.Rptr. 276 [same]; and People v. McIntyre (1981) 115 Cal.App.3d 899, 911, 176 Cal.Rptr. 3 [same].
On the other hand, in People v. Deletto (1983) 147 Cal.App.3d 458, 195 Cal.Rptr. 233 [Third Dist.], the court held that the federal constitutional Chapman standard applied. It explained that the failure to give a unanimity instruction has the effect of lowering the prosecution's burden of proof, and an instruction that lowers the prosecution's burden of proof violates due process. (Deletto, at p. 472, 195 Cal.Rptr. *490 233.) Other cases holding that the Chapman standard applies include People v. Melhado (1998) 60 Cal.App.4th 1529, 1536, 70 Cal.Rptr.2d 878 [First Dist., Div. Three]; People v. Thompson (1995) 36 Cal.App.4th 843, 853, 42 Cal.Rptr.2d 798 [Third Dist.]; People v. Gary (1987) 189 Cal.App.3d 1212, 1218, 235 Cal.Rptr. 30 [Fifth Dist.]; People v. Ramirez (1987) 189 Cal.App.3d 603, 615, fn. 13, 236 Cal.Rptr. 404 [First Dist., Div. Two], disapproved on other grounds in People v. Russo, supra, 25 Cal.4th at p. 1136, 108 Cal.Rptr.2d 436, 25 P.3d 641; People v. Gordon (1985) 165 Cal.App.3d 839, 855, 212 Cal.Rptr. 174 [Third Dist.], disapproved on other grounds in People v. Frazer (1999) 21 Cal.4th 737, 765, 88 Cal.Rptr.2d 312, 982 P.2d 180 and People v. Lopez (1998) 19 Cal.4th 282, 292, 79 Cal.Rptr.2d 195, 965 P.2d 713; and People v. Metheney (1984) 154 Cal.App.3d 555, 563, fn. 5, 201 Cal.Rptr. 281 [Fifth Dist.].
We find Deletto's reasoning more persuasive. "The applicability of the reasonable-doubt standard ... has always been dependent on how a State defines the offense that is charged in any given case...." (Patterson v. New York (1977) 432 U.S. 197, 211, fn. 12, 97 S.Ct. 2319, 53 L.Ed.2d 281.) Like the requirement of jury unanimity, the definition of a crime is a matter of state law (subject to federal constitutional limits). (Schad v. Arizona (1991) 501 U.S. 624, 640 [111 S.Ct. 2491, 115 L.Ed.2d 555] [plur. opn.].) However, once state law has defined what constitutes a single instance of a crime  the unit of prosecution  the federal Constitution requires proof beyond a reasonable doubt that the defendant committed that crime.
For example, California defines both premeditated murder and felony murder as murder in the first degree. (Pen.Code, § 189.) As a result, "jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation." (People v. Nakahara (2003) 30 Cal.4th 705, 712, 134 Cal.Rptr.2d 223, 68 P.3d 1190.) "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, [the jury] need not decide unanimously by which theory he is guilty. [Citations.]" (People v. Santamaria (1994) 8 Cal.4th 903, 918, 35 Cal.Rptr.2d 624, 884 P.2d 81 [perpetration versus aiding and abetting].) "Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt." (Id. at p. 919, 35 Cal.Rptr.2d 624, 884 P.2d 81.)
We believe California could, if it chose, define premeditated murder and felony murder as distinct crimes. That is, a defendant who kills a single person both with premeditation and deliberation and in the commission of a specified felony would be guilty of two crimes (subject, of course, to the limitations on multiple punishment; see Pen.Code, § 654). Once California did so, however, the jury could not convict a defendant of premeditated murder unless premeditation was shown beyond a reasonable doubt; and the same jury could not convict the same defendant of felony murder unless the commission of the murder in the commission of a predicate felony was shown beyond a reasonable doubt. The federal Constitution's reasonable doubt requirement would attach separately to each separate crime.
Moreover, once state law has conferred a right to jury unanimity, the federal Constitution demands that each juror be convinced of the defendant's guilt beyond a reasonable doubt. California could amend its Constitution to provide for 9-3 verdicts in criminal cases; it would *491 be no skin off the federal Constitution's nose. (Johnson v. Louisiana (1972) 406 U.S. 356, 359 [92 S.Ct. 1620, 32 L.Ed.2d 152].) Once California did so, however, the federal Constitution would require that at least 9 of the jurors voting to convict must be convinced of guilt beyond a reasonable doubt. (See id. at pp. 362-363, 92 S.Ct. 1620.) As California has chosen, instead, to demand 12-0 verdicts in criminal cases, the federal Constitution concomitantly requires that all 12 jurors voting to convict must be convinced that the defendant is guilty of the charged crime beyond a reasonable doubt. Otherwise, the reasonable doubt requirement would become meaningless.
"Th[e] requirement of unanimity as to the criminal act `is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (People v. Russo, supra, 25 Cal.4th at p. 1132, 108 Cal.Rptr.2d 436, 25 P.3d 641, quoting People v. Sutherland (1993) 17 Cal.App.4th 602, 612, 21 Cal.Rptr.2d 752.) When the trial court erroneously fails to give a unanimity instruction, it allows a conviction even if all 12 jurors (as required by state law) are not convinced that the defendant is guilty of any one criminal event (as defined by state law). This lowers the prosecution's burden of proof and therefore violates federal constitutional law. (Francis v. Franklin (1985) 471 U.S. 307, 326 [105 S.Ct. 1965, 85 L.Ed.2d 344]; Sandstrom v. Montana (1979) 442 U.S. 510, 521 [99 S.Ct. 2450, 61 L.Ed.2d 39].) We conclude that we must apply the Chapman standard. (See Rose v. Clark (1986) 478 U.S. 570, 579 [106 S.Ct. 3101, 92 L.Ed.2d 460] [Chapman applies to instruction that impermissibly shifts burden of proof].)
"[U]nder the mandate of Chapman ... we must ultimately look to the evidence considered by defendant's jury under the instructions given in assessing the prejudicial impact or harmless nature of the error." (People v. Harris (1994) 9 Cal.4th 407, 428, 37 Cal.Rptr.2d 200, 886 P.2d 1193.) "[W]e must inquire whether it can be determined, beyond a reasonable doubt, that the jury actually rested its verdict on evidence establishing the requisite [elements of the crime] independently of the force of the ... misinstruction. [Citation.]" (Id. at p. 429, 37 Cal.Rptr.2d 200, 886 P.2d 1193.)
Defendant presented a unitary defense with respect to all of the firearms  that they belonged to his mother, and he had no dominion or control over them. By contrast, the defendant in Crawford had different defenses with respect to the different firearms: He claimed he knew nothing about one of the firearms found in his bedroom; his girlfriend testified that she owned the second firearm; and the third and fourth firearms were found in an upstairs bedroom occupied by yet another person. Here, the jury obviously disbelieved defendant's mother's testimony.
As we have already noted, the jury reasonably could have distinguished between the guns seen on May 9 and the guns found on May 11. Moreover, some jurors could have had a reasonable doubt that defendant was in possession of the May 9 guns.
As to the May 11 guns, however, the jury had before it defendant's damning admission: "[M]y guns are in the light fixtures above the kitchen...." Perhaps some jurors still harbored a reasonable doubt as to whether defendant was in possession of the May 11 guns not found in the light fixture (i.e., the guns in the bathroom, the study, and a kitchen cupboard). Once they determined to reject defendant's mother's testimony, however, none *492 of the jurors would have had a reasonable doubt that defendant was in possession of the guns in the light fixture.
We conclude, therefore, that the trial court erred by failing to give a unanimity instruction, but the error was harmless beyond a reasonable doubt.

VI

DISPOSITION
The judgment is affirmed.
We concur: RAMIREZ, P.J., and HOLLENHORST, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, and IV.
[**] See footnote *, ante.