Filed 9/27/13  P. v. Nwuzi CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038485 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. Nos. C1112821, C1121031) |
| v. | |
| CHINEDA EZENUATA NWUZI, | |
| Defendant and Appellant. | |

A jury convicted defendant Chineda Ezenuata Nwuzi of false imprisonment (Pen. Code, §§ 236, 237[1]; count 1), human trafficking (§ 236.1, subd. (a); count 2), criminal threats (§ 422; count 3), and pandering (§ 266i, subd. (a)(2); count 4).  He was sentenced to a six-year prison term for count 4, with concurrent terms for counts 1 through 3.

On appeal, defendant contends that the trial court erred by failing to instruct the jury that it had to unanimously agree on which act constituted false imprisonment.  Defendant also contends that the imposition of separate punishment for counts 1 through 3 violated section 654.  We conclude that a unanimity instruction was not required.  We also conclude that the trial court properly imposed separate terms for the false imprisonment and criminal threats (counts 1 and 3), but violated section 654 by

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

imposing separate punishment for human trafficking (count 2). We will therefore modify the judgment to stay the term for human trafficking.

## FACTUAL AND PROCEDURAL BACKGROUND

Melissa Doe was 21 years old when she moved from Texas to California to live with her boyfriend at his mother's home. Melissa had to leave the home when her boyfriend went to prison and she did not get along with his mother. For a month thereafter, she stayed with various friends.

On June 11, 2011, Melissa was at a bus stop in downtown San Jose waiting for a friend to pick her up. Two men in a vehicle pulled up to the bus stop. The driver, defendant, asked Melissa what she was doing. She replied that she was waiting for her friend. Defendant offered to take her to her friend's house. He also offered her marijuana. Melissa accepted and got into defendant's car. Shortly thereafter defendant dropped off the male passenger.

Melissa's friend was not answering her phone at the time. Defendant suggested that Melissa could pick up her belongings, which were at another friend's home, and go to a motel room until her friend responded to her calls. He said that he could drop her off at her friend's home later. Melissa agreed.

The two picked up Melissa's belongings and then drove to a Safeway. There, defendant met with his female friend, Nemyah Wyatt. The three of them got into Wyatt's car and drove around the city to get a cell phone. After purchasing a phone, they returned to defendant's car. For the next hour to an hour and a half, Melissa sat alone in defendant's car while defendant and Wyatt worked on a laptop in Wyatt's car.

The three then went to a Motel 6, where Wyatt used her identification to rent a room. Wyatt left shortly thereafter. In the room, defendant and Melissa smoked marijuana, and she took a sip of alcohol. Melissa took a shower, changed into her pajamas, and sat on one of the beds.

2

Defendant called Wyatt several times, demanding money. After the phone conversations, defendant became angry and told Melissa that she owed him money for the motel room. He told her that she was going to pay him back by selling her body for money. He set up online ads using a picture of someone who looked like Melissa and identified her as "Sallysmits." The ad generated several calls, one of which was from San Francisco. Defendant told Melissa she needed to go to San Francisco to make money. Defendant was much larger in stature and used a demanding tone with her. She got in the car with defendant because she was scared of him.

Defendant drove Melissa to a San Francisco gas station, where he told her to get out of the car and wait on the corner for a man. He told her that he expected her to have sex with the man and earn money. He gave her a breakdown of prices she should charge for various sexual acts.

A man drove up to the corner and asked Melissa if she was Sally Smith. She said "[n]o" and the man drove away. Melissa returned to defendant's car, and defendant asked her why the man drove off. Defendant was angry. On the way back to the motel, defendant pulled over to the side of the road, opened the door, and told Melissa to get out of the car. He told her that she needed to get him money "or there was going to be consequences." He spoke to her in a "[v]iolent" tone. She asked if he could at least drive her back to San Jose. He agreed and he took her back to the motel room. They both went back to the room and slept on separate beds.

Defendant woke Melissa up at 11:00 a.m. the next morning. He showed her missed calls on the new cell phone and told her that she was "sleeping money away." He forced her to answer some calls and told her what to say on the phone. With defendant listening on the phone next to her, she set up meetings with some of the callers for later that afternoon.

Defendant looked through Melissa's bag and picked out a skirt and a see-through tank top for her to wear. Melissa told defendant that she did not want to wear that outfit,

3

but defendant responded that she was being disrespectful and that she was going to wear the outfit because she could "make a lot of money in it." He then grabbed her by her arms and threw her on the bed.

Defendant climbed into bed with Melissa and offered to give her a massage. She told him she did not want a massage. He got on top of her, told her that he wanted to have sex, and started "dry humping" her. Around the same time, he touched himself in front of Melissa with his genitals exposed. He also touched her breast over her clothes and asked her to "jack him off." She told him to stop several times, but he did not stop until she "got serious" and said, "Get off me . . . I'm not playing." Defendant got off Melissa and said "Bitch I didn't even want you." He took a three to four-minute shower. Melissa gathered her belongings at that time, and she noticed that her bus ticket and her cell phone were missing.

When defendant got out of the shower, Melissa asked him about the bus ticket and cell phone. Defendant became angry and told Melissa that she owed him double the money because he had rented the room for two nights. He also mentioned that she owed him for the phone and for the marijuana, which she had been smoking. He estimated that she owed him about $500. He told her that she was going to get him his money or she was a "dead white bitch" and that girls who took his money had disappeared and never been heard from again. He said he knew "hitters," which she understood to mean "people that kill you."

At some point, Melissa walked towards the motel room door and told defendant "I'll just leave, then." Defendant stood in front of her and said, "No you won't. Until I get the money you owe me, you're not going nowhere."

Defendant then received a phone call from Wyatt, and they began arguing on the phone. Melissa realized that defendant was not paying attention to her and she told him she was going out to get more shampoo. She left the room and ran to the front office.

4

Crying, she told the motel clerk that a man was trying to sell her. She asked the clerk to call the police.

The police arrived and searched defendant's motel room, where they seized a laptop and cell phone. Melissa's bus ticket was found in the trunk of defendant's car. The laptop contained photos of Wyatt taken for a prostitution service website. The laptop also contained ads for "Sally Smits," which had been paid for by defendant. The ads offered sexual services for money. The cell phone contained text messages regarding arrangements for sexual services.

At trial, defendant presented no witnesses on his behalf. During argument to the jury, he questioned whether Melissa was "really held against her will" and suggested that she chose to go to San Francisco with him and chose to stay in the motel room with him.

The jury found defendant guilty of all four charged counts: false imprisonment (count 1), human trafficking (count 2), criminal threats (count 3), and pandering (count 4). Additionally, the trial court found true two prior prison term allegations. (§ 667.5, subd. (b).)

The trial court sentenced defendant to the six-year upper term on count 4, a concurrent five-year upper term on count 2, a concurrent three-year upper term on count 3, and a concurrent three-year upper term on count 1. The court imposed two consecutive one-year terms for the prior prison term allegations, for an aggregate prison term of eight years.[2]

---

[2] In case No. C1121031, as to which no issues are raised on appeal, defendant pleaded no contest to pimping a minor over the age of 16 (§ 266h, subd. (b)(1); count 1), procuring a minor over the age of 16 for prostitution (§ 266i, subd. (b)(1); count 2), and employing a minor in performing sexual conduct (§ 311.4, subd. (c); count 3). The trial court sentenced defendant on that case at the same time as it imposed sentence in case No. C1112821, imposing a consecutive term of one year, four months on count 1, a concurrent term of four years on count 2, and a concurrent term of two years on count 3. The total combined term imposed for both cases was nine years, four months.

5

**DISCUSSION**

**A.     Unanimity Instruction**

Defendant argues that the trial court erred by failing to give a unanimity instruction as to count 1, in which he was convicted of false imprisonment. (See CALCRIM No. 3500.[3])

Defendant claims the evidence showed three separate incidents upon which the jury could have based the false imprisonment conviction: (1) driving Melissa to San Francisco, (2) grabbing Melissa's arms and throwing her on the bed, and (3) blocking her from leaving the motel room. Defendant contends that the trial court should have instructed the jury that it was required to unanimously agree on which act constituted false imprisonment. As we shall explain, we disagree that a unanimity instruction was required, and we find that any error was harmless.

*1.     Legal Principles*

The jury verdict in a criminal case must be unanimous. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) When a defendant is charged with a single criminal act and the evidence shows more than one such unlawful act, the prosecution must either elect which act to rely upon, or the jurors must be given a unanimity instruction telling them they must agree on which act constituted the crime. (*People v. Thompson* (1995) 36 Cal.App.4th 843, 850.)

However, the trial court has no sua sponte duty to instruct on unanimity if the defendant's multiple acts constitute a single continuous course of conduct— that is, if his or her acts are "so closely connected in time as to form part of one transaction.

---

[3] CALCRIM No. 3500 provides: "The defendant is charged with _____ <*insert description of alleged offense*> [in Count __ ] [sometime during the period of __ to __ ]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

[Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 423 (*Maury*).) "The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

> ### 2. The False Imprisonment Conviction Could Not Have Been Based on the San Francisco Incident

We first address defendant's claim that the jury could have based the false imprisonment conviction on defendant's act of driving Melissa to San Francisco against her will. As we shall explain, the prosecutor made it clear that she was not relying on that act for the false imprisonment charge.

During argument to the jury, the prosecutor specified that the false imprisonment charge was based on the events that occurred in the motel room *the day after* defendant and Melissa went to San Francisco. The prosecutor referred to the argument between defendant and Melissa regarding her outfit: "And [Melissa's] response to that was 'Well, I'll just leave then.' And that's when she said she started walking toward the door. And he stood in front of her, and he blocked her path. [¶] And he said, . . . 'No, you won't. Until I get the money you owe me, you're not going nowhere.' [¶] That is the crime of false imprisonment. That is why he's guilty. He blocked her from leaving there. [¶] And then she said that he grabbed her and he threw her on the bed. So now he is using violence to keep her in a room against her will. That is why he's charged with false imprisonment. That is why he's guilty of false imprisonment."

Defendant did not address any of the individual charges during his argument. Instead, he challenged Melissa's overall credibility and argued that Melissa had gone to San Francisco with defendant and stayed in the hotel room not because she was "really held against her will," but because "[s]he chose."

In her closing argument, the prosecutor reminded the jury that defendant had "blocked [Melissa's] way when she tried to get out of the room when they got into the

7

argument about what clothing she was going to wear and that he grabbed her by her arms and he threw her down on the bed." The prosecutor argued: "You cannot dispute that he is holding her against her will when she tried to leave that room." The prosecutor also addressed the defense suggestion that Melissa had willingly gone to San Francisco: "Now, I could make the argument that when he took her to San Francisco, maybe that was a false imprisonment. That's up to you to decide. You might think that's a little bit more ambiguous. But there is nothing ambiguous about him blocking her from leaving the door when she wanted to get out of there."

A reasonable juror would not have understood the prosecutor to be relying on the San Francisco incident as the basis for the false imprisonment charge. The prosecutor "clearly communicated" that the false imprisonment charge was based on defendant's acts of blocking Melissa from leaving the motel room and throwing her on the bed. (See *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539; *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292 [prosecutor "clearly informed" the jury as to which acts she was basing a criminal threats offense].) This election ensured that no jurors would vote to convict defendant of false imprisonment based on the San Francisco incident.

### 3. *Continuous Course of Conduct*

Defendant claims that some jurors could have based the false imprisonment conviction on defendant's act of blocking Melissa's exit from the hotel room, while others could have concluded he was guilty of false imprisonment because he grabbed her and threw her onto the bed. Although the prosecutor did refer to both of these acts during her argument to the jury, we conclude that no unanimity instruction was necessary because the evidence established that the two acts were so closely connected that they constituted a "continuous course of conduct." (*Maury, supra,* 30 Cal.4th at p. 423.)

The California Supreme Court has held that no unanimity instruction was required when the defendant was charged with one rape but the victim testified to two separate acts of rape, based on the " 'single course of conduct' " rule. (*People v. Champion*

8

(1995) 9 Cal.4th 879, 931 (*Champion*), quoting *People v. Beardslee* (1991) 53 Cal.3d 68, 93.) In *Champion*, the defendant raped the victim in the bathroom, left, then returned shortly thereafter to rape her again. The court explained why a unanimity instruction was unnecessary: "[The defendant] offered no evidence tending to show that he committed one of the rapes but not the other; rather, his counsel argued that he did not participate in any of the crimes occurring in the [victim's] home. Thus, once a juror determined that [the defendant] committed one of the two rapes, it is inconceivable that the juror would not also conclude that [the defendant] also committed the second rape of the same victim." (*Champion, supra,* at p. 932.)

In this case, defendant restrained Melissa by grabbing her and throwing her on the motel room bed, and then, shortly thereafter, by blocking her from leaving the motel room. The two acts were closely connected in time, location, and objective. Defendant did not offer any evidence tending to show that he committed one of those acts but not the other, and thus there was no basis upon which any juror would have found that defendant did not commit both acts. (Cf. *Champion, supra,* 9 Cal.4th at p. 932.) Thus, the two acts of false imprisonment were a part of a "continuous course of conduct," and no unanimity instruction was required. (*Maury*, *supra*, 30 Cal.4th at p. 423.)

### 4. Harmless Error

Even assuming that the trial court should have given the jury a unanimity instruction as to the false imprisonment charge, any error was harmless under the circumstances, whether assessed under the standard for constitutional violations (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)) or the standard for state law error (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)). (See *People v. Wolfe* (2003) 114 Cal.App.4th 177, 185-186 (*Wolfe*) [noting split in authority].)

"The erroneous failure to give a unanimity instruction is harmless if disagreement among the jurors concerning the different specific acts proved is not reasonably possible." (*People v. Napoles* (2002) 104 Cal.App.4th 108, 119, fn. omitted.) "[S]uch

9

disagreement is unlikely [when] the true issue in the case was a single credibility dispute." (*Id*. at p. 120.)

Here, defendant "presented a unitary defense" with respect to all of the acts that could have constituted the false imprisonment charge. (See *Wolfe, supra,* 114 Cal.App.4th at p. 188.) His defense was simply a challenge to Melissa's credibility: he argued that Melissa was never held against her will, but rather chose to go to San Francisco and stay in the motel room with him. The jury obviously believed Melissa, however. (See *ibid.*) Once the jurors determined that Melissa was not staying with defendant by choice, none of them would have had a reasonable doubt that defendant committed the acts of false imprisonment that she described. (See *ibid*.) In particular, as the prosecutor emphasized in her closing argument, defendant could not dispute that "he blocked her way when she tried to get out of the room . . . and that he grabbed her by her arms and he threw her down on the bed. . . ."

Therefore, on this record, it is not reasonably probable that a different result would have been reached if the jury had been given a unanimity instruction (*Watson, supra,* 46 Cal.2d at p. 836), and any error in the trial court's failure to give such an instruction was harmless beyond a reasonable doubt (*Chapman, supra,* 386 U.S. at p. 24).

**B.     Section 654**

Defendant contends that the trial court violated section 654 by imposing separate concurrent terms for the false imprisonment, human trafficking, and criminal threat convictions. He argues that he committed all four offenses for the sole purpose of inducing Melissa to become a prostitute (i.e., pandering).[4] As we shall explain, we agree that defendant was improperly punished for both pandering and human trafficking, but

---

[4] A person is guilty of pandering if he or she, "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute." (§ 266i, subd. (a)(2).)

10

we determine that section 654 did not bar separate punishment for false imprisonment and criminal threats.

### 1.     *Legal Principles*

Subdivision (a) of section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." The purpose of the statute is to ensure that the punishment is commensurate with the defendant's culpability. (*People v. Perez* (1979) 23 Cal.3d 545, 550-551 (*Perez*).)

"The proscription against double punishment in section 654 is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute within the meaning of section 654. The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one." (*People v. Bauer* (1969) 1 Cal.3d 368, 376 (*Bauer*).) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he [or she] may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*Perez*, *supra*, 23 Cal.3d at p. 551, fn. omitted.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) On appeal we defer to express or implicit determinations that are based upon substantial evidence. (Cf. *People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

## 2. *Analysis*

Claiming that all of the offenses were incident to the sole objective of inducing Melissa to engage in prostitution, defendant claims he may be punished for only one offense. We disagree. Although defendant's overarching aim may have been to induce Melissa into prostitution, the record supports the trial court's implied determination that in committing the pandering, false imprisonment and criminal threats offenses, defendant "entertained multiple criminal objectives which were independent of and not merely incidental to each other," such that he could be separately punished. (*Perez*, *supra*, 23 Cal.3d at p. 551.)

We first review the factual basis for each conviction. The pandering and human trafficking charges were based on numerous acts that defendant committed over the two-day period. The prosecutor argued that there were "so many things" defendant did to encourage Melissa to become a prostitute, then listed numerous acts, including: (1) saying "he was going to kill her if she didn't work for him and make him money," (2) forcing her "to take a phone call from a john," (3) driving her to San Francisco to meet another man, (4) showing her the ads that he posed online, and (5) telling her how much to charge for sex acts. The prosecutor also argued that defendant did "several things" to deprive Melissa of her personal liberty, as required for a human trafficking conviction: (1) telling her what to wear and throwing her on the bed when she argued with him about it, (2) getting on top of her, exposing his penis, grabbing her breast, and telling her to "jack him off," (3) stealing her bus ticket and cell phone, (4) blocking her path, and (5) threatening to kill her if she did not make him money.

The prosecutor argued that the false imprisonment charge was based on defendant's act of blocking Melissa from leaving the hotel room and his act of grabbing her and throwing her on the bed – his use of "violence to keep her in a room against her will."

12

The prosecutor argued that the criminal threat charge was based on defendant's statement that Melissa was " 'going to get him his money or [she would be] a dead white bitch.' "  The prosecutor argued that this threat was "designed to threaten her and to scare her."

As argued by the prosecutor, defendant had multiple objectives in committing the false imprisonment and criminal threats.  Defendant's overarching objective was to induce Melissa into prostitution, but he had additional objectives that made separate punishment permissible.  Defendant's additional objective in committing the false imprisonment was to keep Melissa in the hotel room, and his additional objective in threatening Melissa was to instill fear in her.  Although keeping Melissa in the hotel room and making her fearful may have made it more convenient for defendant to continue inducing her to become a prostitute, neither objective was necessary to the pandering. (See *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1257 [burglary to obtain key to victim's apartment made it "more convenient and less risky" for the defendant to commit later burglary and assault, but "it was not a necessary or integral part of the subsequent offenses"].)  Moreover, in this case, where defendant committed multiple offenses over a two-day time period, applying "the 'one intent and objective' test" would "defeat[] its own purpose" because it would not ensure that defendant's punishment is commensurate with his culpability.  (*Id.* at p. 1253.)

We conclude substantial evidence supports the trial court's finding that defendant had separate criminal objectives in committing the false imprisonment and criminal threat offenses, and thus that section 654 does not prohibit separate punishment for those convictions.

However, we do agree that the term for count 2, human trafficking, should have been stayed because it was based on the same course of conduct as the pandering charge. The trial court instructed the jury, pursuant to CALCRIM No. 1243, that to prove defendant was guilty of human trafficking, it had to find that he "either deprived Melissa

13

Doe of personal liberty or violated her personal liberty" and "intended to obtain forced labor or services or commit or maintain a felony violation of Penal Code Section 266i (pandering)." Pursuant to CALCRIM No. 1151, the trial court instructed the jury that in order to prove defendant was guilty of pandering, it had to find that he "used promises or threats or violence to cause, persuade, encourage, or induce Melissa Doe to become a prostitute" and "intended to influence Melissa Doe to become a prostitute." During argument to the jury, the prosecutor told the jury that those two offenses were "connected," stating: "Because for human trafficking – for that crime, it requires that the defendant violated Melissa's personal liberty . . . to obtain forced labor or commit a felony, and the felony is pandering . . . pandering is an element of the human trafficking charge."

Based on the evidence in the record, we conclude that the human trafficking and pandering charges were based on an indivisible course of conduct. (See *Bauer, supra,* 1 Cal.3d at p. 376.) Thus, the punishment for the human trafficking conviction should have been stayed pursuant to section 654.

## DISPOSITION

The judgment is modified to stay the sentence for human trafficking (count 2) pursuant to Penal Code section 654. As modified, the judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

MÁRQUEZ, J.