Filed 8/19/15  P. v. Ortiz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARCO ANTONIO ORTIZ,<br><br>    Defendant and Appellant. | G050314<br><br>(Super. Ct. No. 13CF0709)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

*                *                *

A jury convicted defendant Marco Antonio Ortiz of the attempted carjacking of William K. as charged in count one and Mercedes R. as charged in count two, and driving under the influence of drugs, a misdemeanor as charged in count four. The jury found him not guilty of an attempted carjacking of the driver of a Mini Cooper as charged in count three. The court sentenced defendant to eight years in state prison.

I

FACTS

Mark Magrann is an officer with the California Highway Patrol. On February 28, 2013, he was assigned to traffic control with a special assignment to enforce the speed limit and carpool violations and in assisting with calls on the 55 Freeway. At just before 9:00 a.m., he was in the City of Orange stopped on the right shoulder of the southbound 55 Freeway near Chapman Avenue. Traffic was moderate to heavy. Magrann was standing next to his motorcycle assisting in a traffic collision investigation when he observed a black sports utility vehicle (SUV) swerve onto the shoulder, and pass three vehicles at a high rate of speed and then quickly cut right back into the No. 4 lane. Magrann took chase.

The SUV crossed over to the carpool lane, and then to the center divider. At trial, Magrann estimated the SUV was traveling at a speed of "well over 100 miles an hour." Magrann observed the SUV hit the center divider and "spin 180 degrees." As he approached the site, Magrann saw defendant get out of the vehicle from the driver's door. Defendant ran across the freeway to the right shoulder, and Magrann gave him voice commands to stop. Traffic on the freeway had stopped. But on the right side of the freeway, there is a 15- to 18-foot-high sound wall, and defendant ran back onto the freeway toward the center. Defendant then jumped over the center divider, onto the northbound side of the 55 Freeway, and "all the cars traveling northbound start hitting their brakes and come to an abrupt stop." Magrann then observed defendant approach a white pickup truck, and he tried to get into the driver's side door by grabbing the handle.

2

Defendant was not successful in getting into the white pickup truck from the driver's side, and he then ran around it and tried the passenger door. It appeared to Magrann that defendant tried the pickup truck's handle and slapped at its window. The driver of the pickup truck managed to accelerate away. Then defendant approached a BMW that was in the far right lane. It appeared to Magrann that defendant attempted to get into the driver's side of the BMW, and then continued to a vehicle behind the BMW and went near the door of that vehicle momentarily, and then he ran back to the BMW. Defendant's hands were close to the right rear door handle and then the right front door handle, and at that point the BMW accelerated away.

Defendant then ran back toward the southbound direction of the freeway and climbed the center divider once more. Magrann spotted a sheriff's deputy running toward his location. The two officers boxed defendant in, and they took him to the ground. Defendant's mouth "hit" Magrann's shirt and "there was white stuff all over" the shirt. A forensic scientist later testified defendant's blood tested positive for "Midazolam, Lorazepam, Amphetamine, Methamphetamine and THCA."

At trial, the driver of the white pickup truck testified he "noticed a gentleman running across the freeway, and everybody slammed on their brakes." He described what the man did: "He proceeded to go on the right side of the – on the right side of my vehicle and stood up, and when he stopped, stood up, we made eye contact, and he leapt onto . . . . [¶] . . . [¶] . . . the front passenger side of my car. [¶] . . . [¶] [H]e was pounding on the window trying to break my passenger window . . . ." The driver of the white pickup truck continued: "He was holding onto my mirror, I believe with his right arm, and was — and was pounding on the — pounding on the window. [¶] . . . [¶] And I could hear the door lock flicking. I could hear as if somebody was trying to get in . . . . [¶] . . . [¶] I believe he was trying to gain access into my car." The driver was able to accelerate and get away.

3

The driver of the BMW also testified. She said she was taking her two-year-old child to daycare. The child was in a car seat in the backseat of the BMW. She saw a crashed SUV by the center divider and a law enforcement officer and heard some yelling. Then she observed a man darting through the cars and saw him pull onto the handle of a driver's door two or three cars in front of her. She said: "And he wasn't successful in opening the door. So he moved on to another car that was right in front of me. [¶] . . . [¶] He tried to open the – I believe the passenger door on that vehicle." She explained her concern: "I didn't know what was going to happen next. I didn't know, you know, if he was going to break the window or try to steal my car or, you know, hurt me or hurt my son. My son was buckled into his seatbelt. I could get out of the car, but I was mainly concerned for my son's safety and what would happen to him." She locked her doors. She continued to explain what happened: "He started to approach my car, and I turned my vehicle to try to keep him from getting to the car door." When he couldn't get to the driver's side, he ran around to the passenger door and pulled at the right passenger door. He was saying something, but she said, "I couldn't make out what he was saying. It sounded very, like jumbled." He then went to the rear passenger door closest to where her child was and pulled on that door handle as well.

Then the man went to the car behind the BMW, which might have been a Mini Cooper, and pulled on that car door. The driver of the BMW was focused on the man because she was afraid he might come back. She continued to describe what happened: "The gentleman who was trying to get in the vehicles came back to my vehicle and attempted to get back into the same two doors that he had tried previously, so the rear passenger right door. This time he seemed to be – he was more aggressive in his manner to get in the car. [¶] . . . [¶] He was pounding on the right passenger door and mumbling something with . . . an open fist." When he was unsuccessful, the man took off running toward the crashed SUV and ran away.

4

II

DISCUSSION

On appeal, defendant argues the trial court erred by failing to instruct on unanimity "even though the prosecution presented two discrete criminal acts to prove a single charge of attempted carjacking" with regard to count two. The Attorney General disagrees, and argues the evidence at trial "clearly showed a continuous course of conduct."

"'In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]'" (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 183-184.)

"A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses. [Citations.] A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." (*People v. Maury* (2003) 30 Cal.4th 342, 422-423.) In *Maury*, the Supreme Court concluded the "acts were so closely connected in time as to form part of one transaction." (*Id.* at p. 423.) "The unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction. [Citations.] The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

Here, the record indicates defendant hurriedly went from car to car along the freeway, trying unsuccessfully to gain entry. That he tried the handle on the car behind the BMW in between trying to gain entry to the BMW is insignificant in that his attempt to carjack the driver of the BMW was so closely connected in time as to form

5

part of one transaction.  There was no reasonable basis for the jury to distinguish defendant's attempts to gain entry to the BMW before and after he tried the handle of the Mini Cooper directly behind the BMW.  No unanimity instruction was required because there was no reasonable possibility the jury would have decided to convict defendant of more than one discrete crime of attempted carjacking of the driver of the BMW.

## III

## DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

6