Filed 9/26/23  P. v. Estrada CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MANUEL GARCIA ESTRADA,<br><br>    Defendant and Appellant. | D080429<br><br><br><br>(Super. Ct. No. SCD287834) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Helen S. Irza, under the appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Sahar Karimi, Deputy Attorneys General.

This case involves a battery conviction that could have been based on two different moments where the defendant used force against the victim during a physical struggle.  Generally, where only one count is charged but the People submit evidence to the jury showing there was more than one act that could form the basis for a conviction, the ambiguity must be cured in one of two ways:  the prosecution must tell the jury which specific act they are relying on, or the court must instruct the jury that it has to unanimously agree the defendant committed the same specific criminal act.  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).)  But there are exceptions, including where the acts are so closely connected in time as to form a continuous course of conduct.  (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

This case falls squarely within that exception.  The defendant, Manuel Estrada, went into Cesar Galvan's house and then punched him in the throat and/or shoved him up against a wall within a span of minutes.  While these moments are distinct enough to be described separately, they were a part of one continuous course of criminal conduct.  Accordingly, the trial court was under no obligation to provide a unanimity instruction, and we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

In the fall of 2020, Cesar Galvan and Yanelys Garcia, a married couple, were spending an ordinary day at home.   Galvan was watching a football game while Garcia fed their two-year-old granddaughter lunch.  Their neighbor of several years, Manuel Garcia Estrada, was doing yardwork

---

[1]    The defendant and the victims in this case offered rather different accounts of what occurred.  We recite the facts in the manner most consistent with the judgment.

outside in the shared area between the small apartment complex where he lived and the house that Galvan and Garcia rented. But all was not right with Estrada that day; they heard him yelling obscenities and generic threats about killing "everyone," because they were "whores" and "homosexuals." Initially, neither Galvan nor Garcia took it too seriously. Garcia closed the windows so she would not have to listen to Estrada's outbursts.

But then Estrada knocked on their door. Galvan answered, and Estrada pushed his way inside, punching Galvan in the throat and aiming his threats at Galvan and his family. Galvan called out for his wife, who was in the bedroom trying to put their granddaughter down for a nap. She rushed out to help as the two men were struggling. Together, she and her husband tried to push Estrada out of their house through the back door while he fought them.

The back door led to a patio area down a short flight of stairs. Once they succeeded in steering Estrada outside, he and Galvan tumbled down the stairs together. It is unclear whether they merely both fell, or if they were actively fighting at that point. Estrada's head struck something, likely a patio table, opening a gash that would later need to be stapled closed at the hospital. Garcia, who had gone to check on their granddaughter once Estrada was out the back door, came back out with the child and tried to separate the two men. At some point during the scuffle, Garcia apparently saw Estrada shove Galvan up against a wall, but it is unclear if this took place inside or outside of the house.

The commotion on the patio brought the neighbors outside to see what was going on. As Galvan tried to call 911,[2] Estrada struggled with Garcia,

_____

[2] Garcia was the one who eventually made the 911 call on her husband's phone.

shoving her and alarming one of the watching neighbors. The neighbor told Estrada to let Garcia go, and he apparently did. Garcia then retreated inside with the child, where the family locked the door against Estrada. Garcia took her husband's phone to complete the 911 call, and they waited for the police to arrive while Estrada stayed on the patio, yelling at them and brandishing the knife he had been using earlier for yardwork.

The police arrived within 10 minutes and, after sorting through the chaos and a language barrier,[3] arrested Estrada. They also recovered his knife from the back patio.

Estrada was charged with making criminal threats (Pen. Code,[4] § 422), aggravated trespass (§ 602.5, subd. (b)), and battery (§ 242). The case went to trial, where the court allowed the prosecution to amend the complaint due to a defect: the People had charged Estrada with one criminal threat and one battery count as to *both* Galvan and Garcia. As amended, Estrada was charged with two counts of criminal threats (counts 1 and 2), one count of trespass (count 3), and two counts of battery (count 4 [as to Galvan] and count 5 [as to Garcia]).

Garcia, Galvan, and Estrada all testified, along with two neighbors and law enforcement personnel. Estrada's version of events differed significantly from Galvan's and Garcia's. He testified that Galvan provoked him by dripping water on his head from a window while he did yard work. In response, he knocked on the window, told Galvan to stop, and then lost consciousness. When he came to, he was on the back patio with *Garcia* on top of him and Galvan holding a machete over him. He denied ever hitting, pushing, or threatening anyone. He further testified that he believed his

_____

[3]    Most of the involved parties were primarily Spanish-speakers.

[4]    All further undesignated statutory references are to the Penal Code.

4

knife was planted on the back patio because he never took it out of his apartment (even to do yardwork).  In addition to contradicting Garcia and Galvan, his testimony also clashed with the eyewitness accounts from the neighbors.

During closing arguments, the prosecutor did not specify exactly which action of Estrada's it was relying on for the battery count as to Galvan.  While she focused on Estrada punching Galvan in the throat, she also referred to him shoving Galvan against the wall.  The court did not provide a unanimity instruction before the jury deliberated.

The jury convicted Estrada on both counts of battery (counts 4 and 5), but found him not guilty of making a criminal threat to Garcia (count 2).  They deadlocked on the criminal threat count as to Galvan (count 1) and the trespass charge (count 3).  The People elected not to retry counts 1 and 3, and the court dismissed count 5 in the interest of justice (as it had indicated it would do when it allowed the midtrial amendment to correct the charging document).  The court sentenced Estrada to one year of probation and an anger management class.  It also extended an existing protective order to keep him away from Garcia and Galvan.

## DISCUSSION

Estrada challenges his conviction on count 4—the battery on Galvan— because the court did not provide a unanimity instruction to the jury.  In more granular terms, Estrada's position is that the People created a problem by not choosing exactly which battery against Galvan they were submitting to the jury—the throat punch, or the shove against the wall.  As a result, Estrada asserts he could not be properly convicted of the battery count against Galvan without unanimous juror agreement.  Some jurors might

5

have believed he only punched him, while others believed he only shoved him.

Unanimity instructions are meant to prevent this kind of defect in the integrity of a conviction. (See, e.g., CALCRIM No. 3500.) Not only must a criminal jury verdict be unanimous,[5] but the jurors must also unanimously agree on which specific crime the defendant committed. (*Russo, supra,* 25 Cal.4th at p. 1132.) When the prosecution presents evidence of multiple acts that could provide the basis for a conviction, "either the prosecution must elect among the crimes or the court must [sua sponte instruct] the jury to agree on the same criminal act." (*Ibid*; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534 (*Melhado*).)

There are, however, some exceptions to this general principle. One exception arises when crimes that technically could be charged as separate acts constitute a "continuous course of conduct" because they are "so closely connected in time as to form part of one transaction." (*People v. Maury* (2003) 30 Cal.4th 342, 423; see also *People v. Diedrich* (1982) 31 Cal.3d 263, 281–282 (*Diedrich*).) Cases where this exception applies show that a continuous course of conduct is viewed as a "single crime, albeit committed in several possible ways." (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 185 (*Wolfe*).)

In *People v. Flores* (2007) 157 Cal.App.4th 216, 223, for example, where the defendant repeatedly fired a gun from the same place without a

---

[5] The rationale for this requirement comes from the Sixth Amendment. (See *In Re Hess* (1955) 45 Cal.2d 171, 175; *People v. Mota* (1981) 115 Cal.App.3d 227, 231 (*Mota*).) Although it has long been the law in California (see *Russo, supra,* 25 Cal.4th at p. 1132 [discussing the California constitutional provision that indicates "only a unanimous jury may render a verdict" in a criminal case]), it was not until 2020 that the United States Supreme Court decided unanimous jury verdicts in criminal trials are constitutionally required. (*Ramos v. Louisiana* (2020) 140 S.Ct. 1390.)

"significant delay" between shots, the continuous course of conduct exception was appropriate. Similarly, in *People v. McIntyre* (1981) 115 Cal.App.3d 899, 910 (*McIntyre*), the defendant committed two forcible sex acts within several minutes, which constituted one course of conduct. Sexual assaults within an even longer period have also been considered continuous. (*Mota*, *supra*, 115 Cal.App.3d at p. 232 [involving repeated sexual assaults within an hour at the same location]; see also *People v. Madden* (1981) 116 Cal.App.3d 212, 218 [distinguishing a crime spree from a continuous course of conduct].)

Looking to the converse, cases involving distinct enough acts to merit a unanimity instruction are equally helpful to our analysis. For example, *Diedrich* involved acts of bribery that occurred over a four month period. (*Diedrich, supra,* 31 Cal.3d at pp. 267–271.) The temporal separation of these acts was a significant factor in the court's decision to require a unanimity instruction. (*Id.* at p. 282.) In *Wolfe, supra,* 114 Cal.App.4th 177, the lack of clarification created an issue when the defendant could have been convicted of firearm possession for events that occurred on either of two separate days. (*Id.* at pp. 181–182.) *Wolfe*'s commentary that "fragmented" space or time between the acts breaks the continuity of the conduct is particularly useful. (*Id.* at p. 185.)

*Melhado, supra,* 60 Cal.App.4th 1529 further illustrates this concept. In that case, the defendant went to an auto shop three times (9:00 a.m.– 9:30 a.m., 11:00 a.m., and 4:30 p.m.) in one day and threatened the manager. (*Id.* at p. 1533.) But because it was unclear which incident the prosecutor relied on to prove the charge for criminal threats, and the court gave no unanimity instruction, his conviction was reversed. (*Id.* at pp. 1536, 1539.) Taken together, these cases demonstrate that conduct spread over multiple

7

hours or days, or perhaps across multiple locations, exceeds the bounds of the continuous course of conduct exception.

No such distinct break in time or location exists in the case before us. Estrada would probably disagree, suggesting there was a division between the struggle inside the house and the struggle on the patio—which is important in his framing of the case because the punch allegedly occurred inside the house, whereas the location of the wall shove was ambiguous.

But regardless of exactly where or when the wall shove occurred, there was no significant break in Estrada's conduct. There was one fight. It began when Estrada entered the house, persisted as he struggled against Galvan and Garcia while they pushed him out the back door, continued as he fell down the stairs, grappling with Galvan and then Garcia, and ended when his neighbors were all safely inside and had locked him outside on the back porch. The whole incident could not have lasted more than ten minutes.[6] Given this broader picture, "the exact time or sequence" of the shove and the punch are "not material." (*McIntyre*, *supra*, 115 Cal.App.3d at p. 910.) Rather, Estrada's battery of Galvan involved "multiple acts [that] constitute one discrete criminal event." (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 631.) For that reason, no unanimity instruction was required.

Because we find no error, we need not discuss Estrada's contentions that the alleged error was prejudicial and cannot be cured by reinstatement of his battery conviction as to Garcia—which, at any rate, was dismissed in the interest of justice.

---

[6]     Galvan estimated that the struggle in the house lasted a mere two or three minutes, and while no time estimate of the continued struggle on the patio was offered by a witness, it could not have taken more than an additional five minutes given the testimony about what occurred.

## DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.