Filed 10/9/20  P. v. Grimes CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARL ANTHONY GRIMES,<br><br>    Defendant and Appellant. | A156735<br><br>(San Mateo County<br>Super. Ct. No. 18-SF-009027) |

Appellant Carl Anthony Grimes appeals from a judgment of conviction and sentence imposed after a jury found him guilty of making a criminal threat against his domestic partner (Pen. Code,[1] § 422, subd. (a)) and two other misdemeanor counts.  He contends that the evidence supports several examples which the jury could have construed as a criminal threat, and the trial court prejudicially erred in failing to give a unanimity instruction.  We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In February 2019, an amended information was filed charging appellant with making a criminal threat (§ 422, subd. (a); count 1), misdemeanor infliction of domestic corporal injury (§ 273.5, subd. (a);

_____

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

count 2), and misdemeanor false imprisonment (§ 236; count 3). Appellant pleaded not guilty.

## A.   *The People's Case*

The victim, T. Doe,[2] had been in a relationship with appellant for approximately nine years and they have three children together. Arguments about Doe's alleged infidelity were a "common occurrence" and appellant threatened Doe several times, including telling her he would put her "six feet in the ground." He sometimes became violent. In 2015, he punched her in the face, leaving her with injuries that required medical treatment. That same year he also painfully twisted her neck.

Doe stopped living with appellant in July 2017 after he threatened her, saying she needed to stop what she was doing or he would stop her. They resumed their relationship the following month, and the arguments about infidelity resumed. Against Doe's wishes, appellant would follow her wherever she went.

In the summer of 2018, appellant was with Doe every day. They were still living apart but had developed a routine where appellant would drop her off and pick her up from work. Doe worked six days a week at two assisted living facilities, Atria Foster Square (Atria) in Foster City and Peninsula Regent in San Mateo. She worked at Atria from 7:00 a.m. to 2:30 p.m. and at Peninsula Regent from 3:00 p.m. to 11:30 p.m. Appellant would drive her between the two facilities and meet her on her breaks at Peninsula Regent. The arrangement was appellant's idea.

Appellant and Doe shared a cell phone application called "Life Scan 360" which allowed them to track the location of the other's phone. A few days before the instant offense, they argued after appellant accused her of

_____

[2] The victim was referred to by a fictional last name at trial.

2

leaving the building where she worked for 11 minutes. She told appellant she was at work, but he did not believe her.

On July 27, 2018, Doe was outside of the Atria facility waiting for appellant to pick her up. Phong Tang, the concierge, approached her to ask about some reports that she had not turned in. Appellant drove up and became angry when he saw them talking. He yelled and cursed at Tang, ordering him not to touch Doe and accusing him of trying to kiss her. Doe and Tang were merely coworkers and had never been romantically involved. Appellant opened the car door and told Doe to get inside. He continued yelling at her during the 10- to 15-minute drive to Peninsula Regent. Doe testified: "He told me that I need to stop what I am doing or he gonna stop me whatever I am doing." Doe took appellant's statement seriously because it was something he "always" told her when he got mad at her. She felt afraid for her physical safety.

After appellant dropped her off, Doe decided she would not respond to any more of appellant's calls or text messages and would not meet him on her break or at the end of her shift. At some point during her shift appellant sent her a Life Scan 360 check-in message stating he was in Honolulu. She replied by text, stating: "You can stay where you are and fuck as many bitches as you want." This was her last communication with appellant. She was afraid to go home with him. After her shift, she hid under a blanket in the back seat of a coworker's car to avoid being seen and spent the night at another coworker's apartment. The coworker testified that Doe was afraid and had begged her to stay at her home.

The next morning, Doe took an Uber ride to her morning shift at Atria. She knew appellant would be there because she had checked her voicemails that morning. He had left 15 voicemails on her phone between 6:30 p.m. and

3

11:30 p.m. the night before.  In one voicemail, appellant stated he was going to be at Atria "bright and early" in the morning to catch her and make sure she did not make it into the building.

When Doe arrived at Atria, appellant was there waiting for her.  He opened the car door, grabbed her by the shoulder, pushed her, and told her to go with him for coffee.  Doe refused, saying she was late for work.  Appellant continued pushing her and grabbed her hand, trying to force her to go with him.  Appellant moved Doe approximately 50 to 75 feet along the sidewalk.  At that point, Tang and another concierge went outside and told appellant to stop.  Appellant released Doe's hand and she walked into the lobby.  The entire episode lasted five to 10 minutes.  Doe's left hand was red and swollen.

A police officer interviewed Doe, who was visibly upset and looked like she had been crying.  Doe gave the officer one of the voicemails.  She testified that the voicemail made her feel frightened that appellant would physically hurt her.  In the voicemail, he said she had gone "too far" and that "[i]t's gone end tonight real bad for you.  I assure you of that."  He concluded by saying, "[a]nd I'm not fucking playing with you!  Okay?  Cause you're sick!  You need to be put out your fucking misery.  And I do mean put out!  Cause you know what?  You don't know when to fucking stop.  And I'm gone stop yo ass, okay?"

Doe later gave the police the remaining 14 voicemails.  The prosecution played digital audio recordings of all 15 voicemails for the jury.  In the voicemails, appellant was heard making statements such as the following: "You know what, you motherfucker?  I don't know what the fuck your problem is.  I'm over here waitin' on you.  I'm over here parked by the church waitin' on you.  I don't know what the fuck your problem is today.  But you know what?  You wanna start . . . I will fucking end it.  Okay?"  "You ain't

4

even gonna make it out the building." "You ain't even gonna make it to work at Atria in the morning. Okay? I assure you of that." "And it's gonna get real bad today. Okay. . . . Because you're going—you went too far." "Now you know I'm gonna catch up to you. Okay, . . . 'cause you—you—you going too far, way too far. I didn't do anything to you. I'll catch you tomorrow. . . . I'm gonna to catch up to you. I'll catch you tomorrow." "I'll sit here bright and early at Atria in the morning. And you will not get in. You will not get in the door. I assure you. You will not get in the door." On cross-examination, Doe acknowledged that the statements appellant made in the various voicemails were the same sorts of statements he would make "every time" he would get mad at her over the course of their nine-year relationship.

## B.    *The Defense Case*

Appellant testified that before the events in this case, he thought his relationship with Doe was going well because they were spending a lot of time together even though they were living apart. They had verbal disagreements, but not fights. Sometimes he would tell her she had gone too far with her "games" and would ask her to stop, but he did not mean he would harm her in any way. He agreed he sounded kind of "irate" in the voicemails, but said his response was triggered by the final text message he received from her. It was normal for him to leave her angry voicemail messages at times. He never intended for the messages to be understood as threatening bodily harm to anyone.

On cross-examination, appellant testified that he had never been physically violent towards Doe. He denied ever threatening to put her "six feet under the ground," and said she was lying when she said he had hit her or grabbed her by the neck. Regarding the incident on July 27, he said Tang "had his hands all over [Doe] leaning in as if he was trying to kiss [her]. It

5

wasn't that he was speaking to her. He had his hands all over [Doe] when I arrived." He denied having been outraged, claiming he was only "somewhat excited."

Appellant offered benign interpretations of his voicemail statements. For example, when he told Doe she would not make it to work, he meant he would no longer give her rides and she could not get to work without car keys. When he stated she was not going to get out of the building, he meant that she would not leave without him seeing her. And when he said he would " '[p]ut [her] out [her] fucking misery' " he meant that "she needs help" for her mental health problems.

## C.    *Jury Instructions, Verdict, and Sentencing*

Appellant requested CALCRIM No. 3500 (Unanimity), which provides, in relevant part: "The People have presented evidence of more than one act to prove that the defendant committed th[e] offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act [he] committed." The record is silent as to why this instruction was not given.[3]

Jury deliberations began on February 8, 2019 at 11:30 a.m. The jury recessed for lunch between 11:45 a.m. and 12:45 p.m. After lunch, the jury requested a way to listen to the digital audio recordings of appellant's voicemail messages. The jury reached a verdict at 2:15 p.m., finding him guilty on all counts.

---

[3] The People requested CALCRIM No. 3502: "Unanimity: When Prosecution Elects One Act Among Many." The instruction was later withdrawn. The jury instructions were discussed in chambers, but that discussion was not recorded.

At sentencing, the trial court imposed the upper term of three years on the criminal threat conviction, suspended execution of sentence, and placed appellant on three years' probation. As a condition of probation, the court ordered him to serve six months in county jail, with 93 days of credit for time served. The court imposed a consecutive one-year county jail term for infliction of domestic corporal injury, with 364 days of credit for time served, and a concurrent six-month county jail term for the misdemeanor conviction for false imprisonment. This appeal followed.

## DISCUSSION

Appellant contends that the trial court prejudicially erred when it failed to give a unanimity instruction on the criminal threat charge because the evidence supported "multiple instances of alleged criminal threats." He asserts that his constitutional right to a unanimous jury verdict was violated because the jurors could have been divided on which alleged threat constituted the charged offense. He argues that the prosecutor's failure to specify the basis for the charge, and resulting potential sources of division among the jurors, required the court to instruct on unanimity.

We review assertions of instructional error de novo. (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838.) Whether the trial court should have given a "particular instruction in any particular case entails the resolution of a mixed question of law and fact," which is "predominantly legal." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) Accordingly, we examine this issue de novo. (*Ibid.*)

### A.    *Applicable Legal Principles*

In a criminal case, a jury verdict must be unanimous. (*People v. Collins* (1976) 17 Cal.3d 687, 693; Cal. Const., art. I, § 16.) This means that each individual juror must agree the defendant committed a specific offense.

(*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  Thus, "when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act."  (*Ibid*.)  Where the prosecutor does not elect the particular criminal act, a unanimity instruction addresses " 'the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed,' " and it " 'prevent[s] the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict.' "  (*Ibid*.)  A trial court has a sua sponte obligation to give a unanimity instruction when it is supported by the evidence.  (*People v. Covarrubias* (2018) 1 Cal.5th 838, 877.)

"There are, however, several exceptions to this rule.  For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct or a series of acts over a period of time' [citation].  There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime."  (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

## B.    *The Voicemail Threats Formed the Basis for the Jury's Verdict*

Appellant was charged with a single act of threatening Doe.  In count 1 of the amended information, the prosecution charged that "[o]n or between July 27, 2018 and July 28, 2018," appellant violated section 422, subdivision (a), in that he "did willfully and unlawfully threaten to commit a crime which

would result in death and great bodily injury" to Doe, "with the specific intent that the statement be taken as a threat."[4]

Appellant argues that the prosecution presented evidence and argument of at least two criminal threats, appellant's statement in the car to Doe in which he told her "that I need to stop what I am doing or he gonna stop me whatever I am doing," and the statements he uttered in the voicemails. Appellant points out that the prosecution elicited testimony from Doe that she construed the statement in the car as a threat, causing her to fear for her physical safety. Because the prosecution failed to elect the particular criminal act underlying count 1, he continues, it was incumbent on the trial court to give a unanimity instruction.

Contrary to appellant's position, the prosecution relied solely on appellant's voicemail statements—not the statement in the car—as the alleged act that formed the basis for the criminal threat charge. As appellant acknowledges, the prosecution focused its closing arguments on the voicemail threats, describing why these statements satisfied the elements of the charge. We conclude that the prosecution's summation evinces a clear election to rely on the voicemail messages as the basis for count 1.

---

[4] Section 422, subdivision (a) provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

During closing argument, the prosecution stated: "Of course we have a series of voice mails. 'It's going to get real bad for you. I'm going to catch up to you. I'll catch you tomorrow.' In fact, these first two are said multiple times over the course of 15 voice mails. [¶] 'I'll sit here bright and early at Atria in the morning, and you will not get in. You will not get in the door. I assure you, you will not get in the door.' [¶] 'You not gonna make it out the building.' Not only is he saying you won't get in, you won't get out. 'You need to be put out of your fucking misery and I do mean put out because you know what, you don't know when to fucking stop. And I'm going to stop your ass. Okay?'"

The prosecution stated that one of the elements of a criminal threat is that "it has to be clear, specific, immediate, unconditional." The prosecution then explained: "All of the barrage of voice mails that the defendant leaves for [T.] Doe constitute an ongoing act, an ongoing series of threats, but this threat in and of itself by itself is a clear, concise threat." The prosecutor highlighted the following statement from one of the voicemails to illustrate his meaning: " 'You need to be put out of your fucking misery and I do mean put out.' If the first clause didn't make it clear enough, that second one certainly does. He is saying you need to die. There is no other reasonable interpretation to 'You need to be put out of your misery.' That means you need to die. Because you know what, why do you need to die? You don't know when to fucking stop. And I'm going to stop you. You need to die because you won't stop, and I'm going to stop you. That is a roundabout, very clear way of saying I'm going to kill you."

Further, in discounting appellant's credibility, the prosecution emphasized the explanations he offered for the voicemail statements: "Well, let's also go to Mr. Grimes' version of events when it comes to *the actual*

10

*threats, the actual crime.* When he was confronted with the statement, 'You are not going to make it out the building,' what did he say? Did it make sense? Did it explain his conduct? No. He said that, oh, that was just a reference not to harming her, but she is not going to make it out the building without me seeing her. [¶] . . . I asked him what does, 'You need to be put out of your fucking misery' mean? Do you recall his answer? There is no other commonsense explanation for that than you need to die. His answer was, oh, saying that to somebody indicates that you think that they need help. That is not a credible answer." (Italics added.)

In contrast, the prosecution briefly referenced Doe's testimony about the statement in the car, explaining that appellant and Doe "both got in the car, and she was transported to her other job in San Mateo at Peninsula Regent. Argument occurred in the car." Although the prosecutor noted that Doe "did not feel safe going home that night," he did not describe the car statement as the "actual threat" or "the actual crime."

Finally, the prosecution tied the elements of the criminal threat charge specifically to the voicemail statements: "So not only can you consider the history, you can also consider how these statements are being conveyed to [T.] Doe. Not just what the words are precisely on paper but how they came across. And we all heard them. We heard the initial one that she handed over to the police twice, but there is a tone there. Just talking about the statements verbatim doesn't quite grasp the gravity of what's going on there. [¶] In those voice mails, you hear rage. You hear the defendant's jealousy coming through the speaker. You are allowed to consider that in evaluating whether these threats were clear, specific, and to convey that threat, that threat of bodily harm to [T.] Doe. I submit to you when you listen to all those

11

voice mails—and you'll have them back there and you can listen to them again—there is no other interpretation that that is a threat."

The record makes clear that the prosecution's closing arguments regarding the voicemail statements constituted an election for jury unanimity purposes. (See, e.g, *People v Jantz* (2006) 137 Cal.App.4th 1283, 1292 [unanimity instruction not required for criminal threat charge where the prosecution "clearly informed the jury in opening and closing argument that the People were electing the threat set forth in Hall's testimony as the basis of the criminal threats offense"]; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 [prosecutor's election obviated need for a unanimity instruction where "the prosecutor's opening argument elected what conduct by defendant amounted to the crime charged."].)

Appellant counters that the prosecution's opening statements here suggested that the criminal threats charge was "based on both the statement in the car or the statements in the voicemails." In the prosecutor's opening remarks, he told the jury, "During that car ride from Atria in Foster City to Peninsula Regency, he is threatening her, saying things to the effect of, 'I'm going to end you. I'm going to stop you. I'm going to stop you permanently,' things that [T.] Doe will tell you she took as a threat to her life. She was then dropped off at Peninsula Regency and started her shift, a shift that she would not get off until substantially later in that night. She was scared. She made the decision that she was not going to go home or go back with the defendant, was not going to let him pick her up." The Attorney General responds that the opening statement "is more reasonably read as simply his recitation of what the evidence would show (including threats in the car), and not a summary of what evidence premised each charge."

12

We conclude the Attorney General's position is consistent with the record on appeal. It is true that the prosecution initially characterized appellant's statement in the car as a threat. However, when it came time to describing what act constituted the basis for the criminal threat charge, the prosecution devoted its closing argument to a discussion of the voicemail statements, and made only a passing reference to the statement in the car as an "argument" that occurred during the drive.

We find appellant's reliance on *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 (*Melhado*) misplaced. In *Melhado,* the defendant was charged with one count of making a criminal threat in violation of section 422. On the morning of the offense, the defendant threatened the victim, an auto repair shop manager who had impounded the defendant's vehicle for nonpayment, by stating, " 'I'm going to blow you away if you don't bring my car back. I'm going home and I'm going to bring a grenade' " (the "9:00 a.m. statement"). (*Melhado,* at p. 1536.) The defendant returned at 11:00 a.m. "and pulled a grenade from his jacket pocket. He held it up in front of his face and yelled: 'I'm going to blow you away,' and 'I'm going to blow up this place. If I don't get this car by Monday, then I'm going to blow it away." (*Id.* at pp. 1533.) The prosecutor informed the court, out of the jury's presence, that he was relying on the 11:00 a.m. threat to support the section 422 criminal count. (*Melhado*, at p. 1535.) The appellate court found, however, that the "jury was never informed, in so many words, that the prosecutor had 'elected' to rely on the 11 a.m. event and that to convict each juror was therefore required to find that appellant had made a terrorist threat *at that time*." (*Ibid.*) During closing argument, moreover, the prosecutor referenced both threats. (*Id.* at pp. 1535–1536.)

13

The *Melhado* court rejected the People's contention that a unanimity instruction was unnecessary because the 9:00 a.m. statement had been portrayed by the prosecutor's closing arguments as merely an "empty threat." "It is possible to parse the prosecution's closing argument in a manner which suggests that more emphasis was placed on the 11 a.m. event than on the others.  However, even assuming that this was so, we find that the argument did not satisfy the requirement that the jury either be instructed on unanimity or informed that the prosecution had elected to seek conviction *only* for the 11 a.m. event, so that a finding of guilt could only be returned if each juror agreed that the crime was committed at that time." (*Melhado, supra*, 60 Cal.App.4th at p. 1536.)  The court explained:  "If the prosecution is to communicate an election to the jury, its statement must be made with as much clarity and directness as would a judge in giving instruction.  The record must show that by virtue of the prosecutor's statement, the jurors were informed of their duty to render a unanimous decision as to a particular unlawful act." (*Id.* at p. 1539.)

Unlike *Melhado*, there is no need to "parse" the prosecutor's closing arguments in this case.  The closing summation clearly directed the jury's attention to the voicemail statements as the basis for the criminal threat charge, arguing that the "barrage of voice mails" left by appellant constituted an "ongoing series of threats," amounting to a "clear, concise threat."  The prosecution argued that "[i]n those voice mails, you hear rage.  You hear the defendant's jealousy coming through the speaker.  You are allowed to consider that in evaluating whether these threats were clear, specific, and to convey that threat, that threat of bodily harm to [T.] Doe."  In contrast, the prosecution did not characterize the argument in the car as a threat, or even as an "empty threat," instead ignoring the car threat in his summation.  In

14

short, the prosecution's closing argument obviated the need for a unanimity instruction because the jury was informed of its duty to render a unanimous decision as to whether the voicemail statements established a violation of section 422.

## C.   *The Voicemail Statements Fall Within the Continuous Conduct Exception*

Appellant separately contends that a unanimity instruction was required to distinguish between the various threats contained within the many voicemail messages.  We disagree and conclude that the "continuous conduct" exception to the unanimity instruction requirement applies.

"The continuous course of conduct exception arises in two contexts. [Citation.]  ' "The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense.  [Citation.] The second is when . . . *the statute* contemplates a continuous course of conduct of a series of acts over a period of time." ' "  (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 572.)  As our high court has recognized, the " 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Williams* (2013) 56 Cal.4th 630, 682.)

In the present case, all the voicemails were left in sequence during a single evening.  Further, appellant concedes that he presented the same defense to each of his alleged voicemail threats.  Appellant asserted that none of the voicemail statements were intended to convey a threat of physical harm, nor were they understood by Doe as such.  Rather, these statements were appellant's "usual ramblings" and were normal for their relationship. Appellant posits, however, that different jurors could have found his common defense persuasive as to certain statements in the voicemails, but not others. We disagree.  There is no reasonable basis for the jury to have distinguished

15

between the voicemail statements and concluded that some constituted criminal threats and others did not. The voicemail messages conveyed a consistent theme, repeated several times, that appellant was "waiting for her," that Doe was not "going to make it out of the building," that appellant was going to "catch up" with Doe, and that she needed to "be put out of [her] fucking misery." As the Attorney General points out, if the jury was prepared to accept the defense that these statements were benign and in keeping with their tumultuous relationship, it would have found appellant not guilty of the criminal threat count.

At oral argument, appellant's counsel relied upon *People v. Salvato* (1991) 234 Cal.App.3d 872 to suggest that a continuous course of conduct exception is generally inapplicable in a prosecution involving multiple criminal threats by a defendant. (See *id.* at p. 883 [noting that section 422 focuses on a criminal act, a threat, "which ordinarily refers to an act taken at a particular moment in time rather than as a continuous course."].) However, the *Salvato* court recognized that the continuous course of conduct exception may be found where the particular facts of the case show that the acts are " 'so closely connected that they form part of one and the same transaction.' " (*Salvato*, at p. 882.) In *Salvato*, the defendant made a series of threats against his wife over a two-month period as they were going through a divorce. (*Id.* at pp. 876–877.) The threats were conveyed in person, over the telephone, on an answering machine, through the post office, or by third parties, sometimes vocalized, at other times by hand gesture or newspaper clippings. (*Ibid.*) The appellate court found these "numerous acts"—separated by time and place and manner—constituted several "distinct" and "individual" acts, and the defendant "had different defenses to these several distinct acts." (*Id.* at p. 884.) In short, the continuous conduct

16

exception was inapplicable to the facts before the court. *Salvato* bears little resemblance to the present matter, in which appellant left his threatening voicemails in succession over the course of a single evening, the messages conveyed the same theme, and the defendant presented the same defense to these acts. A unanimity instruction was not required under the circumstances.

## D. *Any Error Is Harmless*

Even if we assume that the trial court erred by failing to give a unanimity instruction, for the reasons discussed above we conclude any such error is harmless. Failure to provide a unanimity instruction is governed by the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24.[5] (See *People v. Thompson* (1995) 36 Cal.App.4th 843, 853 [failure to give a unanimity instruction is harmless "[w]here the record provides no rational basis . . . for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that [the] defendant committed all acts if he committed any"].)

Again, appellant did not offer legally distinct defenses to each act. Instead, he offered a single universal defense, namely that none of his statements could be interpreted as a threat to cause Doe physical harm. The verdict demonstrates that the jury rejected appellant's defense and supports

---

[5] There is a split of authority as to whether the state law harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818 or the federal *Chapman* standard applies in the context of a unanimity instruction error. We follow the majority of courts, including our colleagues in the First Appellate District, that have applied the stricter *Chapman* standard. (See *Hernandez, supra,* 217 Cal.App.4th at p. 576; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 188; *Melhado, supra,* 60 Cal.App.4th at p. 1536; see also *Ramos v. Louisiana* (2020) ___ U.S. ___ [140 S.Ct. 1390] [recognizing a Sixth Amendment right to a unanimous jury verdict in state criminal proceedings].)

the conclusion that his testimony was not credibly received.  Given this record, it is not reasonably possible that the jury believed certain acts to be criminal threats while others were not.  Thus, the failure to give the unanimity instruction was harmless beyond a reasonable doubt.  (See *People v. Wolfe* (2003) 114 Cal.App.4th 177, 188; *People v. Gary* (1987) 189 Cal.App.3d 1212, 1218–1219.)

## DISPOSITION

The judgment is affirmed.

 

            _____

             Sanchez, J.


WE CONCUR:


_____

Humes, P. J.


_____

Banke, J.


*A156735  People v. Grimes*