Filed 4/16/21  P. v. Vermillion CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074590 |
| v. | (Super.Ct.No. BAF1900299) |
| BRIAN CRANSTON VERMILLION, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark E. Johnson, Judge.  Affirmed as modified.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Brian Cranston Vermillion and his wife (W.)[1] got into an argument over whether she had engaged in a sex act with her then-boss some 15 to 30 years ago. The argument ended when W. ran out of the house and sought refuge with their next-door neighbors. At that point, she had a head wound, along with scratches, scrapes, and bruises over much of her body.

W. gave multiple accounts of what happened during the argument. Her statement to a police officer, that same night, was the most detailed — and the most incriminating of defendant. In it, she said that defendant beat and kicked her, used a gun to hit her in the head, then fired one shot that narrowly missed her. Her statements to the neighbors, to a 911 dispatcher, and to hospital personnel were less detailed but consistent.

Defendant, on the other hand, told police (and testified at trial) that he and W. merely "wrestl[ed]." She ran outside, but she accidentally fell and hit her head. She came back inside. However, when the argument resumed, she ran outside again. He explained a bullet hole in the bedroom as being due to an accidental discharge, weeks earlier.

At trial, W. changed her story and gave substantially the same account as did defendant.

---

[1] The trial court did not order the victim referred to by a fictitious name. (See § 293.5; this and all further statutory citations are to the Penal Code.) However, we exercise our discretion to accord her protective nondisclosure. (Cal. Rules of Court, rule 8.90(b)(4).)

Evidently the jury believed W.'s statement to the police and disbelieved her testimony at trial. It found defendant guilty on all charges.

Defendant now contends that the trial court erred by:

1. Failing to give a unanimity instruction regarding count 6 (making a criminal threat).

2. Refusing to strike defendant's prior conviction, which was alleged as both a strike and an enhancement.

3. Imposing multiple punishment, in violation of section 654, in two respects:

    a. On count 5 (forcible false imprisonment).

    b. On count 6 (making a criminal threat).

The People concede that the trial court should have stayed the term imposed on count 5 (forcible false imprisonment). We agree. We will modify the judgment accordingly. Otherwise, we find no error. Hence, we will affirm the judgment as modified.

# I

## STATEMENT OF FACTS

As of 2019, defendant and W. had been married for 34 years.

A.     *W.'s Statement to the Neighbors*.

On the night of March 8-9, 2019, around 1:00 a.m., W. banged on the door of the house next door. The neighbors let her in. She was barefoot and wearing a bathrobe. She seemed "terrified."

W. said that defendant had pinned her to the ground and strangled her.  He kicked her and hit her with a back scratcher.  He hit her on the head with a gun.  Then he fired the gun past her head; the bullet went through the floor.

B.     *W.'s 911 Call.*

W. called 911 on the neighbors' phone.  She said, "[M]y husband, . . . he shot at me with a gun, hit my head with the revolver of the gun and cut my head open."  "[T]he bullet missed my head, went into the dresser drawer and went down into the floor."  "I was on the ground.  He told me don't move. . . .  I've got marks all over my body where he kicked me, slapped me, and smacked me with . . . a back scratcher."  "[W]hen he came after me, to grab me again, I ran out the door . . . ."  "[H]e's been drinking."  "[T]his is over a[n] incident that happened a long time ago . . . ."

C.     *W.'s Statement to the Police.*

W. told a responding police officer the following.

Defendant had been drinking.  He and W. were lying in bed when he asked her if she had had sex with a guy she once worked with named Jones.  W. denied it, but defendant accused her of lying.

Defendant said, "I'm gonna beat the fuck outta you."  He put her on the floor, got on top of her, and "was . . . cutting [her] air off . . . ."  He punched and kicked her; she got bruises all over her body.  He beat her with a back scratcher.

Defendant then put a blanket over W. and said, "[D]on't fucking move."  He got a .357 revolver out of a gun safe.  She wanted to get up, but he said, "I told you don't

4

move" and started kicking her again. He hit her in the head with the gun. Defendant then said, "I ou[gh]ta kill you right now" and fired one shot. The bullet went over W.'s head, through a dresser drawer, and into the floor.

Defendant said, "You're lucky I didn't kill you," and put the gun away. He resumed berating W. about Jones and punching and kicking her.

W. managed to get up and go into the bathroom. Defendant helped her wash her head wound. As she was pressing a towel to her head to stop the bleeding, he went and lay down again, but he kept cursing at her.

W. said, "Just let me go . . . I just wanna get out of here." Defendant replied,, "You're not going anywhere. . . . I'm not done with you yet." He added, "I still don't know what I'm gonna do with you yet, if I'm gonna still shoot you or what." He came down the hallway and "went to grab for [her]," but she was able to run away and out of the house.

W. said she could not count the number of times defendant had hit her before.

W. gave a substantially similar account to a second officer a day later.

In addition to her head wound, she had scratches, scrapes, and bruises on her face, neck, shoulders, back, arms, and legs.

In the bedroom, the police found two bullet holes that lined up, one in a dresser drawer and one in the floor. They also found a .357 revolver, in a gun safe, and a back scratcher.

D.    *W.'s Statement at the Hospital*.

W. told hospital personnel that defendant assaulted her while he was drunk.  He choked her with his hands.  "She was struck multiple times on her head and body with punches, kicks, knees, and blunt objects."  She said defendant also fired a gun near her face.

E.    *Defendant's Statement to the Police*.

Defendant told a police officer that he and W. had both been drinking.

They were in bed when he asked her if she ever "mess[ed] around" with a boss she had had 15 or 20 years earlier.  She said, "I only gave him a hand job."  Defendant was angry.

They got up.  Defendant grabbed W. or she grabbed him; they "wrestl[ed]."  At one point, he held her down on the floor.  She got loose (or he let her up), then ran down the hallway and out of a back door.  Once outside, she tripped, fell, and hit her head on a dog kennel.  Defendant took her to the bathroom and helped her clean her head wound.

Defendant got into bed; W. blow-dried her hair.  Suddenly, W. "said something smart."  Once again, he chased her down the hallway and she ran out of the house.

Defendant said he had accidentally discharged a .357 revolver in the bedroom about two weeks earlier.

Defendant also mentioned that "normally, when . . . we get in a fight, the cops come."  He said he had been detained three times for domestic violence.

6

F.    *Defendant's Trial Testimony*.

Defendant's testimony at trial was substantially the same as his statement to the police.  He added that W. got all of her injuries (other than her head injury) a day or two earlier, when she fell into the dog kennel while fixing it.

G.    *W.'s Trial Testimony*.

W.'s testimony at trial was largely consistent with defendant's statement to the police and with defendant's trial testimony.  She testified, however, that she was drinking, but defendant was not.

At first, W. testified that she told the responding officer the truth.  Then, however, she testified that she was lying "the whole time," because she was angry and trying to get defendant in trouble.

II

STATEMENT OF THE CASE

A jury found defendant guilty of:

Counts 1 and 2:  Spousal battery (§ 273.5), one with and one without a personal firearm use enhancement (§ 12022.5, subd. (a));[2]

---

[2]    The jury was instructed that count 1 was based on injuries inflicted "with hands, feet and backscratcher," and count 2 was based on injuries inflicted "with the handgun."

Counts 3 and 4:  Assault with a firearm (§ 245, subd. (a)(2)), both with personal firearm use enhancements;**3**

Count 5:  Forcible false imprisonment (§ 236);

Count 6:  Making a criminal threat (§ 422), with a personal firearm use enhancement; and

Count 7:  Unlawful possession of a firearm (§ 29800, subd. (a)(1)).

In a bifurcated proceeding, after defendant waived a jury trial, the trial court found one strike prior (§§ 667, subds. (b)-(j), 1170.12) and one prior serious felony conviction enhancement (§ 667, subd. (a)) to be true.

As a result, defendant was sentenced to a total of 24 years 4 months in prison, along with the usual fines, fees, and ancillary orders.

### III

### FAILURE TO GIVE A UNANIMITY INSTRUCTION

Defendant contends that the trial court erred by failing to give a unanimity instruction (e.g., CALCRIM No. 3500) regarding count 6 (making a criminal threat).

A.    *Additional Factual and Procedural Background*.

The trial court did not give any unanimity instruction.

---

**3**    The jury was instructed that count 3 was based on "the alleged striking with a firearm," and count 4 was based on "the alleged firing of the firearm."

In his closing argument, the prosecutor indicated that count 6 was based on two separate statements: first, "I ought to kill you right now"; and second, "he's not done with her yet and may still kill or hurt her."

The prosecutor, however, also argued that the personal firearm use enhancement applied to this count because defendant said, "[']I ought to kill you right now['] while holding the gun. He was displaying the firearm in a menacing manner when he said it."

B.     *Discussion*.

"In a criminal case, . . . the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.]" (*Ibid*.)

The crime of making a criminal threat is defined, as relevant here, as "willfully threaten[ing] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat"; the threat must "cause[] that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ." (§ 422, subd. (a).)

9

This has been construed as "prohibit[ing] multiple convictions based on multiple threats toward a single victim during a single encounter. The appropriate unit of prosecution is indicated by section 422's requirement that the victim 'be *in sustained fear* for his or her own safety or for his or her immediate family's safety . . . .' [Citations.] Sustained fear occurs over 'a period of time "that extends beyond what is momentary, fleeting, or transitory."' [Citation.] . . . A violation of section 422 is not complete upon the issuance of a threat; it depends on the recipient of the threat suffering 'sustained fear' as a result of the communication. It is not appropriate to convict a defendant of multiple counts under section 422 based on multiple threatening communications uttered to a single victim during a brief, uninterrupted encounter." (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201.)

Defendant actually made three threats. The first was, "I'm gonna beat the fuck outta you." We disregard this threat, however, because the prosecutor made an election not to rely on it. (See *People v. Brown* (2017) 11 Cal.App.5th 332, 341.) In any event, the evidence showed that W. remained in sustained fear between the first and the second threat, making them both part of one crime.

The second threat was, "I ou[gh]ta kill you right now." Defendant fired one shot. Then he put the gun away. After a period of more cursing and beating, W. was able to get up and go into the bathroom. While she was there, defendant helped her clean up her head: "I went to the bathroom trying to get my head to stop bleeding. And I got a washrag and he goes, 'Let me see it.' . . . [H]e was rinsing my head off with the water.

10

And helping me with the . . . washcloth, you know, to [¶] . . . [¶] stop the bleeding. . . . [A]fter he was rinsing my head off, I go, 'Just give me the towel[,] I need to press it on there.' So I pressed it on there and he went and laid down." Although he was still cursing, defendant observed "I guess we gotta get a divorce now, right . . . ?" When W. responded, "I just wanna get out of here," defendant uttered the third threat: "I'm not done with you yet." "I still don't know what I'm gonna do with you yet, if I'm gonna still shoot you or what."

A reasonable juror could find that, between the second and the third threat — after defendant put the gun away and while he helped W. treat her head wound — her fear abated. Or, to put it another way, a juror could have a reasonable doubt as to whether she remained in sustained fear throughout this period. On this view of the evidence, it showed two discrete crimes.

The People do not argue otherwise. What they do argue is that this case comes under the continuous course of conduct exception to the requirement of a unanimity instruction.

In this context, "continuous course of conduct" is a catch-all term, which, somewhat confusingly, embraces two wholly distinct principles.

"First, the continuous-course-of-conduct exception applies '"when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time" [citation].' [Citation.] For example, where the defendant is charged with one count of continuous sexual abuse of a child [citation], even if based on a series of acts over time, a

11

unanimity instruction is not required. [Citation.] As already noted, however, a unanimity instruction is not required when the evidence shows only one discrete crime. Thus, this is not really an *exception* to the requirement.

"Second, the continuous-course-of-conduct exception applies when (1) 'the acts are so closely connected in time as to form part of one transaction,' (2) 'the defendant tenders the same defense or defenses to each act,' and (3) 'there is no reasonable basis for the jury to distinguish between them. [Citations.]' [Citation.] 'This exception "'is meant to apply not to all crimes occurring during a single transaction but only to those "where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto." [Citation.]' [Citation.]" [Citation.]' [Citation.] Again, however, it is not at all clear that this is truly an *exception*. It would seem more accurate to say that, in this situation, a unanimity instruction is required, but the failure to give one is harmless. [Citation.]" (*People v. Lueth* (2012) 206 Cal.App.4th 189, 196.)

Having already decided that the evidence showed two discrete crimes, we are concerned only with the second prong of the continuous course of conduct exception. Under this prong, the acts were closely connected in time. Also, defendant tendered the same defense to all of them — essentially, that W.'s statement to the police was not credible. "[T]he instruction is unnecessary when the defendant proffers the same defense to multiple acts because a guilty verdict indicates that the jury rejected the defendant's defense in toto. [Citation.]" (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 572.)

12

Finally, the jury had no reasonable basis to distinguish between them. They were shown by the same evidence — W.'s statement to the police — which, as defense counsel argued, the jurors could either believe or not.

Defendant argues that the beginning of W.'s statement to the police lacked details that she supplied later in her statement. At the beginning, the officer asked, "So what happened?" W. responded with a brief summary — the argument; the threat to beat her, followed by a beating; the shot that just missed her; her retreat to the bathroom; the third threat; and her escape. The officer then asked, "[T]ell me again how it began." This time around, he prompted her with questions. Thus, W. told the same story, albeit in more detail. In this later portion of the interview, she mentioned for the first time the second threat, "I ou[gh]ta kill you right now."

On this record, no reasonable juror would have concluded that W.'s initial brief summary was truthful, but her subsequent detailed account was not. Obviously, the structure of her account followed from the structure of the officer's questioning. And obviously she thought it more important to volunteer that defendant fired a shot at her than to volunteer what defendant said just before he did so. Accordingly, defense counsel never made the argument that defendant is now raising.

Defendant also argues that the third threat — "I still don't know what I'm gonna do with you yet, if I'm gonna still shoot you or what" — was conditional. The People concede that it was conditional; they even concede that it was not sufficiently unconditional to constitute a criminal threat (hence, they argue, the jury must have relied

on the second threat).  We decline to accept this concession.  Along with those words, defendant also said, "You're not going anywhere. . . .  I'm not done with you yet."  He said he was either "gonna still shoot [her] *or what*."  (Italics added.)  In other words, he was threatening her unconditionally with harm of some kind; the only doubt was as to whether he would harm her by shooting her.

Therefore, the continuous course of conduct exception applied, and the trial court did not err by failing to give a unanimity instruction (or if it did, the error was harmless).

Separately and alternatively, the asserted error was harmless for another reason.

"[T]he harmless error standard applicable to this error [is] the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 . . . ."  (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 180.)[4]

---

[4]     The People assert that "there is a split of authority as to whether the *Chapman* or the *Watson* standard applies for reviewing prejudice when the trial court fails to give a unanimity instruction."  In this division, however, it is firmly established that the *Chapman* standard applies.  (*People v. Wolfe*, *supra*, 114 Cal.App.4th at p. 180; accord, *People v. Hernandez*, *supra*, 217 Cal.App.4th at p. 570.)

A small minority of California courts have held that the error does not violate the federal constitution.  (E.g., *People v. Vargas* (2001) 91 Cal.App.4th 506, 562.)  However, they relied on *Johnson v. Louisiana* (1972) 406 U.S. 356, which had held that the federal constitutional requirement of a unanimous jury of twelve persons did not apply to the states.  (*People v. Vargas*, *supra*, at p. 562.)  Recently, the United States Supreme Court overruled *Johnson* and held that the federal constitutional requirement of a unanimous jury of 12 persons does apply to the states.  (*Ramos v. Louisiana* (2020) ___ U.S. ___, ___ [140 S.Ct. 1390, 1397] [lead opn. of Gorsuch, J., joined by Ginsburg and Breyer, JJ.; see also *id*. at p. 1408 [conc. opn. of Sotomayor, J.); *id*. at p. 1410 [conc. opn. of Kavanaugh, J.]; *id*. at p. 1421 [conc. opn. of Thomas, J.].)  This confirms our view that failure to give a unanimity instruction, when required, violates the federal constitution.

Here, on count 6 (making a criminal threat), the jury found the personal firearm use enhancement to be true. It had been instructed that, to find this enhancement true, it had to find that, "during the commission of th[e] crime," defendant "[d]isplay[ed] [a] firearm in a menacing manner," "[h]it[] someone with [a] firearm," or [f]ire[d] the weapon." (CALCRIM No. 3146.)

While uttering the second threat — "I ou[gh]ta kill you right now" — defendant was holding a gun; immediately afterward, he fired it. Before uttering the third threat — "I still don't know what I'm gonna do with you yet, if I'm gonna still shoot you or what" — he put the gun away, evidently in a safe. He helped W. wash her head. He was lying on the bed, without the gun, when he made this threat. The jury could not reasonably find that the enhancement applied to the third threat.

Accordingly, we are convinced beyond a reasonable doubt that the jury unanimously found defendant guilty of making a criminal threat based on the second threat. Some or all of the jurors may have believed that he was also guilty based on the third threat; nevertheless, this was not essential to their verdict.

IV

REFUSAL TO STRIKE THE PRIOR CONVICTION

Defendant contends that the trial court erred by refusing to strike his prior conviction.

15

A.     *Additional Factual Background.*

At sentencing, defendant was 60 years old. He was a veteran, having been honorably discharged from the Army after 10 years' service.

W. wanted defendant released.

Defendant had a 1998 misdemeanor conviction for driving under the influence. (Veh. Code, § 23152, subd. (b).) He had been placed on probation.

He also had a 1999 felony conviction for attempted murder. (§§ 187, subd. (a), 664, subd. (a).) He had been placed on probation, on conditions including a 189-day jail term. In 2005, after his successful completion of probation, the trial court had expunged the conviction. (§ 1203.4, subd. (a).) This was the strike prior.[5]

According to defendant, the strike prior arose from an incident in which a person broke into his home while he was asleep. At the time, defendant was employed as a property manager; he recognized the person as a tenant he had evicted. They fought; he stabbed the tenant with a gardening tool. The tenant left. Defendant grabbed a gun and stood in the doorway. The tenant turned around and headed toward him. Defendant told him to stop, or he would shoot him. The tenant kept coming, so defendant fired a warning shot over his head.

According to the police report, the victim went to defendant's apartment. As the victim was leaving, defendant was seen pointing a rifle at him and yelling, "I'm going to

---

[5]     A conviction that has been expunged under section 1203.4 may nevertheless be used as an enhancement and as a strike. (§ 1203.4, subd. (a); *People v. Diaz* (1996) 41 Cal.App.4th 1424, 1430.)

16

kill you [N-word]." Defendant fired once, then walked back inside. The police found that the victim had 14 cut or stab wounds. Defendant claimed self-defense, but the "injuries observed on defendant were inconsistent with the attack he described." Witnesses contradicted his claim that he merely fired a warning shot. Also, he was only the maintenance man, not the property manager.

B.     *Additional Procedural Background.*

Defendant filed a motion to strike the prior, both as a strike and as an enhancement. The prosecution filed an opposition.

After hearing argument, the trial court denied the motion. It explained that there were similarities between defendant's commission of the prior and his commission of the current offenses, including "severe violence."

At sentencing, defense counsel once again asked the trial court to strike the prior serious felony conviction enhancement. It did not do so.

C.     *Discussion.*

Under section 1385, a trial court has discretion to dismiss a strike prior. (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 529-530.) It also has discretion to strike a prior serious felony conviction enhancement. (Compare § 1385, Stats. 2018, ch. 1013, § 2, p. 6672, with former § 1385, subd. (b), Stats. 2014, ch. 137, § 1, pp. 2111-2112.)

With respect to striking a strike, the focus of the analysis must be on "'whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and

17

prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

"Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.)

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 375.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citation.] Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial

judge.'"'  [Citation.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*Id*. at pp. 376-377.)

A trial court has had the power to strike a prior serious felony conviction only since January 1, 2019.  Thus, the applicable legal standards have not been fully fleshed out.  Nevertheless, it seems clear, by analogy, that this, too, is a discretionary decision, which turns on whether the particular defendant falls outside the spirit of the enhancement.

The trial court could reasonably find that defendant did not fall outside the spirit of either the three strikes law or the prior serious felony conviction enhancement.  He does not cite any case holding that it was an abuse of discretion, under similar or analogous circumstances, *not* to strike a prior.

Defendant argues that the prior was remote.  The trial court acknowledged that; however, it felt this factor was overcome by the fact that defendant engaged in similarly violent conduct, despite the lapse of 20 years.  Moreover, defendant had not led a blameless life in the interim.  He had hit W. more times than she could count, and he admitted having been detained for domestic violence three times.

Defendant claims the strike prior was not serious, as shown by the fact that he was sentenced to only about six months of actual incarceration.  The facts, however, as shown by the police report, were inconsistent with his claim of self-defense.  They suggested he

19

was just lucky that the victim was not actually shot. He may have gotten a relatively lenient sentence for other reasons, such as witnesses becoming unavailable.

Defendant also argues that, because he was 60, the sentence was tantamount to life in prison. In general, getting older reduces recidivism. Defendant showed this was not true in his case. For this reason, the trial court could reasonably sentence him exactly as it would a younger defendant.

Finally, defendant notes that his wife wanted him released. However, this is very common in domestic violence cases; while it can be considered, it cannot be controlling.

The question before us is not whether we would have stricken the prior, either in toto, or with respect to certain counts or certain purposes. The question is whether any reasonable trial judge could have denied the motion. One could, and one did.

V

SECTION 654

Defendant contends that the trial court imposed prohibited multiple punishment, in two respects.

A.    *Legal Background.*

Section 654, section (a), as relevant here, provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

20

"[T]he statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)

"[I]f we conclude that the case involves more than a single act — i.e., a course of conduct — . . . we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives. [Citations.]" (*People v. Corpening*, *supra*, 2 Cal.5th at pp. 311-312.) "'" . . . If all of the offenses were incident to one objective, the defendant may [not] be punished . . . for more than one.'"' [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

"'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.' [Citation.] The court's express or implied findings in support of its determination that section 654 does not apply will be upheld on appeal if substantial evidence supports them. [Citation.]" (*People v. Cruz* (2020) 46 Cal.App.5th 715, 737.)

21

B.      *Term for Forcible False Imprisonment.*

First, defendant contends that the trial court erred by imposing a separate and unstayed sentence on count 5 (forcible false imprisonment).

The People concede the error. We agree. The prosecutor argued that defendant committed the false imprisonment when he put a blanket over W. and ordered her not to move while he got the gun out of the safe. Thus, it was committed to facilitate the assaults with a firearm. (See *People v. Williams* (2017) 7 Cal.App.5th 644, 695 [false imprisonments were committed to facilitate robberies].)

The appropriate appellate remedy is to stay the shorter term (§ 654, subd. (a); *People v. Norrell* (1996) 13 Cal.4th 1, 9) — here, that would be the term on count 5. We will do so.

C.      *Term for Making a Criminal Threat.*

Second, defendant contends that the trial court erred by imposing a separate and unstayed sentence on count 6 (making a criminal threat). He argues that this count was committed with the same intent and objective as the two counts of assault with a firearm, namely "to punish [W.] for alleged infidelity such that she feared for her life." This formulation itself, however, can be viewed as conflating two separate intents — to punish for alleged infidelity *and* to cause fear for one's life.

These crimes were committed by separate physical acts. "[T]he court could reasonably have found that [defendant] committed the assault[s] with the objective of inflicting *physical* harm on [W.], whereas [defendant] criminally threatened [W.] with the

22

separate objective of inflicting *mental or emotional* harm." (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 95, and cases cited.)

Defendant argues that, in *In re Raymundo M.*, *supra*, the assault and the threat were "spread out over space and time." Be that as it may, it formed no part of the appellate court's reasoning. Rather, the court relied on the evidence permitting an inference that the defendant had separate intents and objectives. We do the same here.

## VI

## DISPOSITION

The term imposed on count 5 (forcible false imprisonment)— one year four months — is stayed. (See part V.B, *ante*.) This stay will become permanent once defendant has served the remainder of his sentence. As a result, the total sentence is reduced from 24 years 4 months to 23 years. The judgment as thus modified is affirmed. The superior court clerk is directed to prepare an amended sentencing minute order and an amended abstract of judgment and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. (§§ 1213, 1216.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

MENETREZ
J.

23